No. 85,604

STATE OF KANSAS, *Appellee*, v. FREDDIE E. BOORIGIE, JR., *Appellant*.

(41 P.3d 764)

Opinion filed March 8, 2002.

*Laura B. Shaneyfelt*, of Wichita, argued the cause, and *Leslie F. Hulnick*, of Hulnick Law Offices, P.A., of Wichita, was on the briefs for appellant.

*Jared S. Maag*, assistant attorney general, argued the cause, and *John K. Bork*, assistant attorney general, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his convictions of first-degree murder, arson, impairing a security interest, and six counts of criminal solicitation, claiming the trial court (1) lacked jurisdiction over the criminal solicitation charges; (2) failed to suspend the proceedings pending a competency hearing as required by K.S.A. 22-3302; (3) erred in admitting defendant's statements made to investigators; (4) erred in admitting evidence under K.S.A. 60-455; (5) erred in refusing to instruct the jury on the lesser included offenses; (6) committed cumulative errors depriving him of a fair trial; and (7) erred in sentencing him.

The defendant, Freddie Boorigie, and his wife, Betty Jenell Boorigie (Jenell), were separated. The defendant was living with another woman, Michelle Harrod. On the morning of December 23, 1998, the defendant visited his 6-year-old adopted daughter, Marijke, at the family farm where Marijke lived with her mother. The defendant and Marijke did chores at the farm and returned to the house later that afternoon. The exact time of their return to the house is a disputed fact, but the time frame is between 4:30 and 5 p.m. According to the testimony of Marijke, the defendant went into the house to talk to Jenell, while Marijke played basketball in the garage and waited for her father to return. After a short while, the defendant returned, and he and Marijke left in Jenell's Suburban automobile to Christmas shop in town.

At approximately 6:20 p.m., a Federal Express driver arrived at the farmhouse to deliver a package. The driver saw smoke pouring

from under the eaves and realized the house was on fire. A United Parcel Service (UPS) driver arrived at approximately the same time. The UPS driver checked the doors of the house, then paged his office and requested that they call 911 and report the fire.

At approximately 6:25 p.m., firefighters arrived. The defendant returned to the farmhouse shortly after the firefighters arrived. Defendant initially told the firefighters that no one was home. A few minutes later, the defendant informed the firefighters that his wife, Jenell, was in the house. He informed the firefighters that Jenell had been having trouble with the clothes dryer. He said that to make the dryer work, Jenell would spray WD-40 in the back of the dryer. Boorigie then added, "[Y]ou know what WD-40 and a gas dryer will do." Firefighters discovered Jenell's body in the fire debris of the laundry room.

Fire scene investigators concluded that the fire had been deliberately set between 4:45 and 5 p.m. An electrical engineer and fire investigators examined the clothes dryer and the scene of the fire. They determined that although the gas hose to the dryer had been cut and kinked, the cut did not penetrate the inner membrane of the hose; therefore, the dryer's gas hose was not the cause of the fire. The Kansas Bureau of Investigation (KBI) chemistry unit analyzed debris from the fire and ascertained that the debris contained some gasoline-type hydrocarbons, as well as hydrocarbons from a fuel oil or a heavier petroleum product, which are combustible liquids.

Dr. Erik Mitchell, a forensic pathologist, performed an autopsy on Jenell's body and concluded that Jenell had died of manual strangulation prior to the fire. The petechial hemorrhages on Jenell's neck indicated that she had been grasped around the neck and lifted upwards during the strangulation. The doctor also found a fresh blunt trauma injury to Jenell's temple.

Boorigie was a suspect. When questioned by law enforcement officers, Boorigie blamed Jenell's murder on Bryan Treetop, a person who had allegedly sold wheat for Jenell, never paid her the proceeds, and left town owing Jenell $300,000. The KBI made an extensive search for Treetop. No record of such a person was found. Boorigie was charged and arrested in Montgomery County.

It is important to note that prior to trial Boorigie was held in custody in the Montgomery County, Linn County, and Elk County jails.

While awaiting trial, the defendant contacted his sister and brother-in-law, Cindy and Thomas Falke, by letter. In the letter, the defendant asked his brother-in-law to tell the police that he was at the Boorigie farmhouse on December 23, 1998, and had observed Jenell slip in the utility room and hit her head on the freezer. The defendant's sister and brother-in-law refused to make such a statement.

The defendant also asked Michelle Harrod to solicit a mutual acquaintance to confess to the killing of Jenell. Harrod refused to ask her acquaintance to admit to the murder.

Jason Myers, a corrections officer at the Montgomery County Detention Facility where the defendant was temporarily incarcerated, testified at trial that Boorigie offered him $10,000 to help find someone to confess to the murder. Myers informed the authorities of the offer.

Scott Thomas, an inmate housed in the Elk County Jail with the defendant, testified that Boorigie offered him $50,000 to find someone who would admit that he or she killed Jenell. Thomas testified that Boorigie gave him a hand-drawn diagram of the farmhouse and stated that if Thomas could get someone to admit to the murder, Boorigie could get out of jail, find the real killer, and then get the individual who confessed released from incarceration.

Thomas Espe, another inmate at the Elk County Jail, testified that Boorigie offered him $50,000 or the farm to find someone who would admit that he or she killed Jenell. The defendant also drew a layout of the utility room and indicated the position of Jenell's body and gave the drawing to Espe. Espe declined to participate in the crime. Espe gave the drawing to a jailer.

Boorigie requested that Lyle Springer, a notary, falsely notarize a deed to the farm that the defendant had backdated to a date prior to Jenell's death and had signed Jenell's name. Springer refused.

While released on bond pending trial, Boorigie sold 30 head of mortgaged cattle for $15,000. He did not pay the bank the proceeds of the sale.

Boorigie was rearrested on December 26, 1999, after he assaulted Michelle Harrod. He remained in jail until trial. After a 10-day trial in Montgomery County, Boorigie was convicted of first-degree premeditated murder, arson, impairing a security interest, and six counts of criminal solicitation and was sentenced to life with parole eligibility after 40 years. The district judge also ordered an upward durational departure on the arson charge, doubling the sentence to 38 months, and sentenced the defendant to 7 months on each of the other counts. The sentences were ordered to run consecutively. Boorigie appealed, raising numerous issues.

### Improper Venue

Boorigie was charged and convicted in count 6 of criminally soliciting Jason Myers, in Wilson County, to find someone to falsely confess to the murder of Jenell which occurred in Montgomery County. Boorigie was also convicted in counts 9 and 10 with criminally soliciting two men in the Elk County Jail to find someone to admit to killing Jenell.

Except as otherwise provided by law, the prosecution shall be in the county where the crime was committed. K.S.A. 22-2602. The defendant contends that venue for counts 6, 9, and 10 was in Elk and Wilson Counties and that the charges were improperly filed in Montgomery County; therefore, the Montgomery County District Court lacked jurisdiction to convict him of these charges. The State argues that because the criminal solicitation in Elk and Wilson Counties concerned a crime committed in Montgomery County, venue was properly in Montgomery County.

Section 10 of the Kansas Constitution Bill of Rights provides that in all prosecutions, the accused is entitled to a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed.

Count 6 of the amended information charged:

"That on or about December 20, 1999, Freddie Boorigie, Jr., in Montgomery County, Kansas, did contrary to the statutes of the State of Kansas, unlawfully and intentionally requested [sic] Jason Myers, in violation of K.S.A. 21-3303, to commit the crime of aiding a person charged as a felon, in violation of K.S.A. 21-3812(b), by requesting the said Jason Myers to find and engage an individual to testify falsely at the defendant's trial that the said individual killed Betty Jenell

Boorigie on December 23, 1998, and the defendant did so with the intent that he would avoid trial, conviction and punishment for the felony of the first degree murder of Betty Jenell Boorigie, in violation of K.S.A. 21-3401."

The facts at trial were that Boorigie initially made arrangements to meet Myers in Montgomery County, but the defendant had miscommunicated with Myers and the two failed to meet. Myers was again contacted by Boorigie, and the two eventually met at a convenience store in Fredonia, Wilson County.

Counts 9 and 10 of the amended complaint charged Boorigie, while in custody for the Montgomery County crime, with criminally soliciting Thomas and Espe in Elk County, Kansas.

Generally, venue lies in the county where a criminal act occurs. K.S.A. 22-2602. However, where two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur. K.S.A. 22-2603.

Boorigie did not object to venue at trial. He now argues venue is a jurisdictional issue which cannot be waived and can be raised for the first time on appeal. He cites *State v. Redford*, 242 Kan. 658, 750 P.2d 1013 (1988), for support. Redford had also failed to object to venue at trial. Citing *State v. Moore*, 226 Kan. 747, 602 P.2d 1359 (1979), the *Redford* court determined that the defendant's lack of objection to venue at trial was irrelevant because venue is a matter of jurisdiction. *Redford*, 242 Kan. at 672.

It is also important to note that in *Redford*, the defendant was charged with aggravated kidnapping, rape, and various other crimes. The victim had been abducted in Sedgwick County, but evidence indicated that the rape might have occurred in Ellsworth County. Redford was charged in Sedgwick County with kidnapping and in Ellsworth County with rape. The two cases were consolidated and tried in Sedgwick County. The *Redford* court found that venue was proper in Sedgwick County because the victim's resistance to sexual intercourse was overcome by fear and force during the initial kidnapping in Sedgwick County. The kidnapping in Sedgwick County was the requisite to the commission of the rape in Ellsworth County. The *Redford* court concluded that venue for

the rape charge was proper in either Sedgwick or Ellsworth County.

The State argues that while there is no authority directly supporting venue for all the crimes Boorigie was charged with and convicted of being appropriate in Montgomery County under these particular circumstances, logical support is found in *State v. Jones,* 9 Kan. App. 2d 106, 673 P.2d 455 (1983). In *Jones,* the defendant was being held in the Allen County Jail awaiting trial when he became ill. Defendant was transported to a Kansas City, Missouri, hospital. When he was released from the hospital, he failed to return to Allen County. Jones was later apprehended in another state and returned to Allen County to face the original charge, as well as an additional charge of aggravated escape. Jones challenged the jurisdiction of the Allen County court to try him on the escape charge because he did not commit any act related to his escape in Allen County. The *Jones* court ruled, however, that Allen County, as the place to which the appellant was obligated to return in order to face the original charge, was the logical venue for the escape from custody charge and that it had jurisdiction to charge and convict the defendant of the subsequent crime. 9 Kan. App. 2d at 107.

Similarly, in this case, Montgomery County was the county where the defendant faced the original charges and it was the place in which the crimes the defendant solicited false testimony for were committed. In *Jones* and this case, the subsequent criminal charges were a direct outgrowth of the original charges committed in the county ultimately exercising jurisdiction to try the defendants. In both cases, the offenders had been taken into custody for crimes committed in that county and then transferred out of the county where they committed acts that gave rise to the subsequent charges. And, much as the appellant's escape in *Jones* was aimed at avoiding prosecution in Allen County, Boorigie's efforts to find someone to falsely testify were for the sole purpose of avoiding prosecution in Montgomery County. Comparing these similarities, and considering the direct link between the Montgomery County criminal charges and the crimes committed in Elk and Wilson Counties, it is logical that Montgomery County was a proper venue

for the prosecution of the defendant's solicitations for false testimony.

Additional support for trying the defendant in Montgomery County for all the crimes committed is found in K.S.A. 22-2607. K.S.A. 22-2607(a) allows for the prosecution of someone who, among other things, "advises, counsels or procures another to commit a crime," in the county where the principal crime was committed even if the act of advising or procuring another to commit the crime took place outside the county.

We note that where two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur. See K.S.A. 22-2603. The nexus for counts 6, 9, and 10 were defendant's requests in Elk and Wilson Counties for individuals to find someone to falsely confess to the murder that occurred in Montgomery County. Under K.S.A. 22-2603 and the rationale of the *Redford* court, prosecution for count 6 was proper in either Wilson or Montgomery County and prosecution for counts 9 and 10 was proper in either Elk or Montgomery County.

### Proceedings Pending a Competency Determination

During a pretrial hearing on March 13, 2000, counsel for the defendant orally moved for a competency evaluation:

"MR. BROWN: I have a matter as far as an oral motion on a competency evaluation request. Do you want to do that now?

"THE COURT: That's fine. We can do that now.

"MR. BROWN: I indicated to the Court and counsel I visited with my client and I don't want to go into specifics, but given the things that have occurred since I've come into the case, I think a competency evaluation would be warranted. I believe we have a local mental health facility available to do this.

"THE COURT: That wouldn't slow things down. Any objection by the State?

"MR. BORK: The State has no objection with the motion, Your Honor.

"THE COURT: Motion will be granted and I think that can be performed here by Four County Mental Health.

"MR. BROWN: And I might be mistaken, but don't we need to do an arraignment on the 2000 case?"

A competency evaluation was ordered. The district judge then proceeded to the pending arraignment and ruled on several other mo-

tions. The court received the results of the evaluation prior to trial. On the morning of trial, the district judge stated:

"The first matter we need to take up has to do with the motion for competency determination. It is my understanding that Mr. Boorigie has been through that process, and in fact this morning when I got here, I received an envelope. Apparently it was mailed several days ago, but I only got it this morning, but it contains the report from Four County Mental Health and in sum that report indicates Mr. Boorigie is competent to stand trial. I'll just simply ask counsel for defense do you have anything additional to add?"

Neither the defense counsel nor the prosecutor stated any additional information. The judge continued:

"All right. Based on the conclusions in the report, I'll make a finding for the record then, Mr. Boorigie, that you are competent to stand trial."

Boorigie contends that the trial court violated Boorigie's statutory and due process rights when it failed to stay all proceedings pending a determination of whether he was competent to stand trial. K.S.A. 22-3302 provides, in part:

"(1) At any time after the defendant has been charged with a crime and before pronouncement of sentence, the defendant, the defendant's counsel or the prosecuting attorney may request a determination of the defendant's competency to stand trial. If, upon the request of either party or upon the judge's own knowledge and observation, *the judge before whom the [criminal] case is pending finds that there is reason to believe that the defendant is incompetent to stand trial the proceedings shall be suspended* and a hearing conducted to determine the competency of the defendant." (Emphasis added.)

Boorigie now argues that the statute clearly states that if the judge finds reason to believe the defendant is incompetent, all proceedings *shall be* suspended until competency of the person charged can be determined. The State asserts that the statute is directory rather than mandatory. The State then argues that even if the statute is mandatory, Boorigie invited error when after the motion for a competency evaluation was granted, his counsel suggested that other matters be taken up by the judge.

Here, based on the statement of defense counsel, the judge had reason to doubt Boorigie's competency. Was it error for the district judge to continue with motions and other proceedings pending an evaluation? First, we note that defense counsel requested that the

judge continue with the arraignment on the 2000 case. A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal. *State v. Saleem*, 267 Kan. 100, 109, 977 P.2d 921 (1999). Furthermore, the defendant's subsequent competency evaluation determined that the defendant was competent to stand trial. Although Boorigie suggests that he may have been incompetent at the time of the arraignment on the 2000 case and subsequent pretrial motions conducted prior to the competency evaluation, he was found to be competent.

Boorigie is unable to state any decisions the judge made during that period in which the proceeds should have been suspended that may have prejudiced his rights to a fair trial. Under our circumstance, it does not matter if the statute is directory or mandatory. Errors that do not affirmatively cause prejudice to the substantial rights of the complaining party do not require reversal when substantial justice has been done. *State v. Clark*, 263 Kan. 370, 376, 949 P.2d 1099 (1997).

### Admission of Defendant's Statements

During trial, the court excused the jury from the courtroom and held a *Jackson v. Denno* hearing to determine the admissibility of prior statements made by the defendant to police. The relevant facts are:

On March 19, 1999, charges were filed against the defendant. On March 29, 1999, the defendant was represented by retained counsel, Bruce Borders, in a hearing where the amount of bond was discussed and the preliminary hearing was scheduled. He was again represented by Bruce Borders on April 20, 1999, in a hearing on the issue of bond. On May 4, 1999, Stephen Joseph entered his appearance as co-counsel for the defendant. At the preliminary hearing on June 7, 1999, the defendant was represented by Stephen Joseph and Bruce Borders. On November 16, 1999, Joseph moved to withdraw, and on November 17, 1999, Borders moved to withdraw. Both motions were granted. The defendant indicated to the judge that he "hoped or expected or wanted to be able to retain Joseph and Borders, but hadn't done that yet." The judge tentatively appointed John Gillett on December 16, 1999, but Gil-

lett advised the court the next day that he would not enter an appearance. Gillett filed a motion to withdraw on December 27, 1999. An order was entered on that same day granting Gillett's motion. On December 29, 1999, the court spoke to attorney Michael Brown by telephone. Brown said he was willing to enter an appearance on behalf of the defendant. Brown did not enter an appearance at that time, however, because the court had set a telephone hearing for January 3, 2000, to ascertain whether the defendant had retained his other counsel. Brown was appointed by the court to represent the defendant on January 6, 2000.

While the defendant was released on bond, he violated the terms of his bond and was rearrested on December 26, 1999. On December 29, 1999, during the period when the defendant was not represented by counsel and was incarcerated at the detention center, Kevin Kitterman, an investigator with the State Fire Marshall's office, had the defendant transferred from the Montgomery County Detention Center to the sheriff's office to interview the defendant.

Kitterman and another officer asked the defendant if he was represented by counsel. The defendant indicated that he was not. The officers then asked the defendant if he was willing to talk to them. The defendant agreed, and the officers then advised him of his *Miranda* rights. The defendant acknowledged his rights and signed the *Miranda* form. The officers then interviewed the defendant.

During the interview, the defendant told the officers that Jenell had wanted to become more involved in the farming operation, so he allowed her to contract the wheat hauling. According to the defendant, she contracted with a wheat hauler named Bryan Treetop. The defendant stated that he had given information about Treetop to his attorneys and that his attorneys were supposed to give that information to the police. The defendant also said that he had hired a private investigator to find Treetop. The defendant continued to focus on Treetop as the murderer, reiterating his theory that Treetop killed Jenell because Treetop owed Jenell $300,000 and would not have to pay her if she were dead.

The officers related to Boorigie that when they arrived at the burning house, the door was locked. The defendant answered that it was customary for Jenell to lock the house when she was home alone. The defendant asked the officers if they had found a key to the house during their search of the house. When the officers said that they had not, he told them that there was a key missing. The defendant noted that he, Jenell, and possibly Debbie Fox, Jenell's cousin, had keys to the farmhouse. He speculated that whoever killed Jenell was in the house at the time he and Marijke returned to the house on the afternoon of the murder.

The officers then confronted Boorigie with evidence that there may have been two or three prior attempts by the defendant on Jenell's life. The defendant acknowledged to the officers that a short time before her death, Jenell had suffered an electrocution while helping him with some electric fencing and that on another occasion someone had put sedatives in Jenell's coffee. Boorigie admitted that Jenell suspected him of trying to kill her, but denied doing so. The officers then asked him about an incident where Jenell opened the door of a trailer on the property and was hit by a blast of heat or fire because someone had left the propane on in the trailer. He denied being there at the time.

Boorigie admitted to the officers that he had an affair with Jenell's good friend and that the woman had a child by him. He also admitted to going to a notary and attempting to get Jenell's signature notarized on a deed.

The officers then confronted Boorigie with the allegation that he had solicited Myers to find someone to confess to killing Jenell. Boorigie admitted that he had offered Myers $10,000 to find Treetop and had offered another man $20,000 to find the killer.

When the officers told Boorigie that Marijke was saying that he had gone back into the house on the afternoon of the fire, defendant admitted that he was briefly separated from Marijke while they were at the farmhouse on the afternoon of the fire and that during that time he had gone back into the office area of the shop.

Boorigie asked the officers to investigate whether a $1,000 social security check, $400-$500 in cash, and Jenell's jewelry were missing from the farmhouse. The defendant told the officers about a

post office box he kept in Independence where he received correspondence he did not want Jenell to see. Boorigie also admitted to physically harming Michelle Harrod when he found that she had slept with her ex-husband.

The court ruled that Boorigie's statements made in custody was admissible. At trial, Boorigie's attorney objected to testimony relating to the statements. On appeal, the defendant contends that his statements to the officers were entered into evidence in violation of his Fifth and Sixth Amendment rights to counsel and, in addition, the statements unfairly damaged his credibility with the jury. The State argues that the admission of Boorigie's statements was not in contravention of a defendant's constitutional rights because, at the time of the interrogation, Boorigie was not represented by counsel. The State argues that at the time of the interview the defendant had not obtained substitute counsel, nor asserted his Sixth Amendment right to counsel, and knowingly waived his right not to talk with law enforcement officers prior to making the statements. The State argues that under these circumstances, Boorigie's statements to the officers were admissible.

The Fifth Amendment protection against compelled self-incrimination provides the right to counsel during custodial interrogations. *Edwards v. Arizona*, 451 U.S. 477, 482, 68 L. Ed. 2d 378, 101 S. Ct. 1880, *reh. denied*, 452 U.S. 973 (1981). The Sixth Amendment which guarantees assistance of counsel also provides the right to counsel at postarraignment interrogations. *United States v. Gouveia*, 467 U.S. 180, 81 L. Ed. 2d 146, 104 S. Ct 2292 (1984). Once the defendant is in custody for a crime, efforts to elicit incriminating information from the accused, including law enforcement officers' interrogation, represent critical stages at which the Sixth Amendment applies. *Massiah v. United States*, 377 U.S. 201, 205, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964).

The rules concerning custodial interrogation and the defendant's exercise of a constitutional right are well established. A suspect in custody must be advised that he or she has the right to remain silent and the right to the presence of counsel before the suspect may be interrogated. *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). If the accused asks for coun-

sel, the interrogation must cease until counsel is present. 384 U.S. at 474; see *Edwards*, 451 U.S. at 481-82.

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . . [A]n accused . . . having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85.

Boorigie had asserted his right to remain silent. In determining whether events subsequent to the exercise of a constitutional right constitute a waiver of the previously asserted right, the court must first determine whether the accused actually invoked the right and, if so, the court must then determine whether the accused (a) initiated further discussions with the police and (b) knowingly and intelligently waived the previously asserted right. *Smith v. Illinois*, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984).

In *Minnick v. Mississippi*, 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486 (1990), the State of Mississippi proposed an exception to the *Edwards* rule that police-instigated interrogations without counsel present after the suspect requests an attorney violate a suspect's right to counsel under the Fifth and Fourteenth Amendments. The State asserted that the protection of *Edwards* terminated once counsel had consulted with the suspect. The United States Supreme Court rejected the State's proposition, stating:

"The exception proposed, furthermore, would undermine the advantages flowing from *Edwards'* 'clear and unequivocal' character. Respondent concedes that even after consultation with counsel, a second request for counsel should reinstate the *Edwards* protection. We are invited by this formulation to adopt a regime in which *Edwards'* protection could pass in and out of existence multiple times prior to arraignment, at which point the same protection might reattach by virtue of our Sixth Amendment jurisprudence, see *Michigan v. Jackson*, 475 U.S. 625 (1986). Vagaries of this sort spread confusion through the justice system and lead to a consequent loss of respect for the underlying constitutional principle." 498 U.S. at 154-55.

The *Minnick* Court held that when counsel is requested by the accused, all interrogation must cease, and officials may not reini-

tiate interrogation without counsel present, whether or not the accused has consulted with his attorney. In context, the requirement that counsel be "made available" to the accused refers not to the opportunity to consult with an attorney outside the interrogation room, but to the right to have the attorney present during custodial interrogation. The *Minnick* Court found that this rule was appropriate and necessary, since a single consultation with an attorney does not remove the suspect from persistent attempts by law enforcement officials to persuade a defendant to waive his rights and from the coercive pressures that accompany custody and increase as it is prolonged. 498 U.S. at 151-52.

Here, the police initiated the custodial interrogation with Boorigie which led to statements later used by the State in its case in chief against the defendant. The interrogation concerned the crimes for which the defendant had retained an attorney to represent him. The questions are (1) whether the retaining of an attorney by the defendant in the early stages of the prosecution constituted an invocation of his right to be represented by an attorney, foreclosing any further police-initiated interviews, and (2) whether the fact that the police-initiated interview took place at a time after defendant's retained attorney withdrew and before another attorney entered an appearance in the case affects the outcome.

In *U.S. v. Harrison*, 213 F.3d 1206, 1213-14 (9th Cir. 2000), the court saw no reason to ignore Harrison's representation merely because it began before indictment. The court observed that anyone who retains counsel in connection with a criminal investigation would consider himself or herself to be represented in the event charges are brought and would not expect to be required to affirmatively reassert that representation. The court concluded a defendant invokes the Sixth Amendment right to counsel as a matter of law when (1) the defendant retains counsel on an ongoing basis to assist with a pending criminal investigation; (2) the government knows, or should know, the defendant has ongoing legal representation relating to the subject of the investigation; and, (3) the eventual complaint brings charges precisely anticipated by the scope of the pre-indictment investigation. 213 F.3d at 1213.

Based on *Harrison*, the State's argument that Boorigie did not assert his right to counsel fails. Here, Boorigie asserted his right by retaining counsel to assist with the defense of his case. The law enforcement officers were aware that although not represented by counsel during the interview, Boorigie had previously retained counsel. The next question is whether the fact that the police-initiated interview took place at a time when the defendant was not represented by counsel and the defendant signed a waiver of the right to counsel's presence nullifies Boorigie's assertion of his right to counsel.

It was the right to deal with the police only through counsel that was asserted by Boorigie when he invoked the right to counsel by retaining an attorney to represent him in this case. Although his retained counsel subsequently withdrew, it is clear that the State knew that Boorigie wanted to be represented by counsel—the judge stated that he had contacted substitute counsel but was awaiting the defendant's answer regarding whether he could get his own attorney to reenter the case before appointing substitute counsel. Under such circumstances, Boorigie's statements admitted into evidence in the State's case in chief would violate the defendant's right to counsel if incriminating.

The State argues that even if the defendant's statements to police were erroneously admitted into evidence, the erroneous admission is not grounds for reversal because Boorigie's statements to the officers were the same exculpatory statements he had previously made to officers. We note that the Sixth Amendment requires suppression of an accused's statement if, after the initiation of adversary proceedings, the State, or its agent, deliberately elicited an incriminating statement. See *Massiah*, 377 U.S. at 206.

We have previously stated that a "confession," in a legal sense, is an acknowledgment of guilt made by a person after an offense has been committed and does not apply to a mere statement or declaration of an independent fact from which such guilt may be inferred. When a person only admits certain facts from which the jury may or may not infer guilt, there is no confession. *State v. Green*, 254 Kan. 669, 683, 867 P.2d 366 (1994).

We note that the defendant's statements to the officers were consistent with his earlier statements of innocence to the officers. The statements did not infer guilt or incriminate him. The facts that convicted the defendant were admitted into evidence through other witnesses and were overwhelming. Under the circumstances, the admission into evidence of the defendant's exculpatory statements to officers while in custody and without his attorney being present was not error.

## K.S.A. 60-455 Evidence

Three requirements must be satisfied to admit evidence under K.S.A. 60-455. First, the evidence is relevant to prove one of the facts specified in the statute. Second, the fact is a disputed, material fact. Third, the probative value of the evidence outweighs its potential prejudice. If these requirements are met, the scope of appellate review is limited to whether the trial court abused its discretion. *State v. Lane*, 262 Kan. 373, 388, 940 P.2d 422 (1997).

Over the objection of the defendant, the trial court admitted into evidence three categories of prior bad acts: violence against former wives, previous fires, and prior insurance claims made by the defendant. Boorigie contends that this evidence was inadmissible because it prejudiced his right to a fair trial. The State argues that each of the categories of evidence admitted was relevant to prove facts allowed by K.S.A. 60-455 and that the probative value of such evidence outweighed its prejudicial effect.

## Violence Against Former Wives

At the hearing on the State's motion to admit prior bad acts pursuant to K.S.A. 60-455, the prosecutor pointed out that the evidence at trial would show that the victim died of strangulation, probably by someone's hands, prior to the start of the fire. There was bruising to the back or the side of the skull, which was consistent with a person placing his or her hands around the victim's neck and slamming her head against a wall. The prosecutor noted that at the time of the murder, the victim and the defendant were separated, and the defendant was having an affair with another woman. The prosecutor compared the facts of the defendant's

abuse of Jenell and his prior wives, then argued the defendant's prior acts of violence against his former wives were relevant to prove identity of the killer and his intent, plan, and absence of mistake or accident.

The judge noted that although the prior abuse did not result in convictions, it was relevant to the State's allegations, the wives were available to testify and would be subject to cross-examination, and the jury would be able to weigh the evidence appropriately. Then, noting the similarity between the prior bad acts and the allegations against Boorigie, the judge overruled the defense objections and granted the prosecutor's motion to admit the evidence pursuant to K.S.A. 60-455.

Carol Banning testified that she was married to Boorigie from 1979 to 1985. During most of the marriage, she lived in the rural residence where the fire and murder of Jenell occurred. During her marriage to Boorigie, the defendant was abusive to her on numerous occasions. When he was angry with her, defendant would grab her around the neck and throw her across the room or up against the wall. He would often pick her up by the neck and tell her that she was not going to talk to anyone about his business. This type of abuse occurred at least twice a month. She noted that Boorigie's abuse of her seemed to get worse when the defendant was having extramarital affairs. The defendant would threaten Banning that she would never see the children again or that he would make sure that she would not talk anymore.

Jane Robles testified that she was married to Boorigie from 1985 to 1994. During that time, she and Boorigie lived in the same rural residence as did Banning and Jenell. During the marriage, Boorigie and Robles often quarreled. When Boorigie became angry, he would lift Robles by the neck and throw her.

Robles related specific occasions when Boorigie had attacked her. On one occasion, the defendant had previously reported to an insurance company that his farm implement, a 36-foot disk, had been stolen. Robles later found out that the disk was actually on a farm in Oklahoma. During an argument, Robles threatened to tell the insurance company where the disk was located. Boorigie be-

came incensed and tore the telephone from the wall. He then attacked her, tore off the nightgown she was wearing, and burned it.

On another occasion in 1992, Boorigie placed a hot iron on the carpeted floor after he became enraged with Robles. The iron left a burned spot on the rug. Boorigie then threatened to burn the house with Robles and her children in it.

It is important to note that it is not necessary under K.S.A. 60-455 that prior offenses be identical in nature to the offense for which the defendant is on trial; it is sufficient if the offenses are similar. *Lane*, 262 Kan. at 390. The similarities between the prior abusive acts and the facts of this case are striking. As such, the evidence was relevant under K.S.A. 60-455 to prove a disputed, material fact at trial. We find that the probative value of the evidence outweighed its potential prejudice; therefore, the trial judge did not abuse his discretion in admitting the evidence.

### Evidence of Previous Fires

At the preliminary examination, the State had presented evidence of 16 previous fires with which the defendant was associated. The State was restricted to presenting evidence of four of those prior fires at trial.

The first of the fires occurred in 1983. This was a fire in a shed located directly behind the house where Jenell was living at the time of her death. At the time of the fire, the defendant was married to Banning. Boorigie had moved his farm equipment into the shed and was in the process of wiring the shed with the help of another person. After working in the shed on the morning of the fire, Boorigie left the property, telling Banning he was going to town. Shortly after Boorigie left, Banning looked out the window and saw that the shed was on fire. As she picked up her daughter and started to leave the house, the telephone rang. Boorigie was the caller. He wanted to know if anything was wrong. The building and equipment in it were destroyed by the fire.

The next fire occurred about 1 year after the shed fire. The defendant owned a lime truck used to spread lime on crop land. On the day of the fire, Boorigie, who had been working on the brakes of the truck, came into the house to tell his wife that he was

going to his mother's house, which was 3 or 4 miles away. Boorigie did not take his daughters with him, which was unusual. Shortly after Boorigie left the house, he returned to tell his wife that they did not have to worry about the lime truck anymore because it had gone into the creek and that a fire had started around the lime truck after it went into the creek. Boorigie made an insurance claim for the damage to the truck.

The third fire occurred in a hay barn on a ranch where Boorigie was farming a growing crop in 1992. The defendant appeared at the scene of the fire, saying he had seen the fire from U.S. Highway 75, which was about 2½ miles from the ranch. The owner of the ranch did not believe it was possible for the defendant to have seen the fire from the highway. A spraying rig belonging to the defendant was destroyed in the fire. Boorigie and the ranch owner negotiated a settlement for the destroyed sprayer.

The final fire occurred in a wheat field the defendant was farming at the Mullendore Ranch in 1998. Boorigie claimed that he had harvested the field prior to the burning and claimed an insurance loss for poor yield. When the insurance investigator examined the field, he discovered that the field had been burned before it was harvested.

Again, we note that a conviction is not a prerequisite to introduction of a prior offense under K.S.A. 60-455. *State v. Myrick & Nelms*, 228 Kan. 406, 420, 616 P.2d 1066 (1980). Admission of evidence under K.S.A. 60-455 to show plan may be upheld on the theory that the evidence, although unrelated to the crimes charged, shows the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes. *State v. Tiffany*, 267 Kan. 495, Syl. ¶ 3, 986 P.2d 1064 (1999).

The evidence that Boorigie had previously been associated with mysterious fires supported an inference that Boorigie was familiar with the use of fire as a way of solving problems. The evidence of the prior fires was relevant to prove identity or plan, both disputed facts at trial, and the probative value of the evidence outweighed its potential prejudice. The trial judge did not abuse his discretion in admitting the evidence.

## Prior Insurance Claims

During the hearing on the prosecutor's K.S.A. 60-455 motion, the prosecutor proposed introducing evidence that although the defendant's prior claims were suspicious, the insurers elected not to prosecute defendant for fraudulent claims because it was more cost efficient to pay the claims than to litigate them. The trial judge expressed concern regarding the prejudicial nature of such evidence:

"I guess my concern is if [the] motive [for] introducing evidence of prior years average receipts from insurance benefits were simply to show Mr. Boorigie's sophistication in understanding how insurance could be available down the road, that's one thing. The prejudicial part of it is that it would give the appearance that all of those prior claims were questionable, and yet there's not going to be any evidence to show that, so it's going to be conjecture, and that would seem to me to be highly prejudicial."

The prosecutor then agreed to limit the evidence to testimony that the defendant filed claims annually and was paid on those claims an average of $78,000 a year until 1995, when the insurers discontinued payments. The prosecutor argued that the evidence was relevant to show that the defendant had a financial need and that life insurance proceeds were available; hence, there existed a financial motive for killing Jenell and burning the house. The court agreed to admit the evidence.

At trial, the prosecutor introduced evidence that Boorigie had received insurance payments averaging approximately $83,000 a year from the government for the years 1989 to 1995. A compliance investigator for the Department of Agriculture testified on direct examination:

"Q. Now, if we do a little bit of math here and if we combine the last five years payoff from the State of Kansas and the State of Oklahoma, how much would that represent of an annual payment for Mr. Boorigie, Junior, for those last five years?
"A. That average payment would be $83,114.00.
"Q. Now both for Kansas and in Oklahoma the last payment was what year?
"A. 1995.
"Q. Okay. And when did you visit — when did you meet Jenell Boorigie, Junior?
"A. Um, the first time I met Jenell was July 17, 1996.
"Q. And what was the purpose of that meeting?

"A. To obtain records we had requested from Mr. Boorigie, um, on production, seed, fertilizer, chemical tickets."

There was no objection to the testimony by defendant's counsel. At the close of evidence, the judge instructed the jury:

"Evidence has been admitted tending to prove that the defendant committed crimes other than the present crimes charged. That evidence may not be considered by you as evidence of a general disposition on the part of defendant to commit crime. It may only be considered by you as follows:

"1. Evidence of prior fires may only be considered by you for the purpose of proving defendant's identity, motive, knowledge, intent and plan as to the arson charged in Count 2 or in the Alternative Count 2.

"2. Evidence of prior crimes against defendant's ex-wives may only be considered by you for the purpose of proving defendant's intent, identity, plan and absence of mistake or accident as to the charge of murder in Count 1.

"3. Evidence of prior insurance claims may only be considered by you for the purpose of proving defendant's motive, intent, plan and identity as to the charge of murder in Count 1 and the charge of arson in Count 2 and the Alternative Count 2.

"4. Evidence of correspondence between defendant and Cindy Falke setting forth defendant's attempt to have an unknown person claim responsibility for the death of Betty Jenell Boorigie may only be considered by you for the purpose of proving defendant's identity, motive, knowledge, intent, plan and absence of mistake as to the charge of. murder in Count 1; the charge of arson in Count 2 and the Alternative Count 2; and the charges of criminal solicitation in Counts 4, 5, 6, 9, and 10."

Boorigie asserts that the witness testified that he met with the Boorigies for the first time in 1996 to collect supporting documentation about the crops and expenses, and that after that, the defendant received no further payments. The defendant contends that the evidence strongly suggests that there was something improper about the insurance claims—the inference the trial court specifically sought to avoid by limiting the evidence admitted. When the trial record is read in context, the testimony does not suggest that the insurance claims were suspicious.

As presented, the evidence of prior insurance claims tended to prove that the defendant had a financial motive for murder and arson. As such, the trial judge did not abuse his discretion in admitting the evidence.

## Lesser Included Offenses

A criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial did not exclude a theory of guilt on the lesser offense. *State v. Moncla*, 262 Kan. 58, 73-74, 936 P.2d 727 (1997).

At trial, the defendant requested a jury instruction on second-degree murder and voluntary manslaughter as lesser included offenses of first-degree premeditated murder. The trial court refused to instruct on either of the lesser included offenses, reasoning:

"Looking at it from the point of the view of the jury, and what evidence is available for them to consider, first of all, there is evidence that there were prior incidences between the parties and between the Defendant and his prior wives, what have you, that might lead to a basis for finding heat of passion, spur of the moment type scenarios. However, in the evidence in this case, the only evidence that the jury has to consider is that on the day of the killing there was no argument. There's no quarrel. There's no evidence of any heat of passion issues. The only evidence is that, um, the circumstantial evidence concerning the prior acts of violence that would lend themselves towards the issue of premeditation. Absent some evidence for the jury to rely on to make a finding of heat of passion, then the included offense of voluntary manslaughter just simply doesn't apply. In regard to the second degree murder, that's an intentional killing. There's evidence that she was intentionally killed, but in order for the jury to make a finding of intentional killing without premeditation, they again would need to take into consideration what other evidence is there, and the only evidence that is there would lend itself to support planned intent to dispose of her. I'm talking about the prior evidence concerning electrocution and that type of thing, so although normally I think it's the better practice to include a lesser included instruction for the jury, it's improper to do that if there isn't some evidence for them to make that finding on. The evidence is there that this was an intentional killing. The only other evidence that we have has to do with Mr. Boorigie and the prior incidents between the two individuals, and the only thing that I can see that the evidence would support would be a finding of premeditation, if they, in fact, find that Mr. Boorigie did it. They're going to have to find whether he did or didn't, and if they find he did, the only evidence surrounding the relationship would indicate a premeditation, because of the prior acts that were put out, so I don't know that they'll find that, but I think based on that, the only proper instruction would be strictly an all or none on first degree murder, and if they find to not choose premeditation, then

he will be acquitted. The State's going to have to live with it the same as the defense would."

Boorigie contends that the prosecutor's evidence that Boorigie had a quick and violent temper and would fly into rages when provoked was sufficient to support an instruction for the lesser included offenses. The State points out that Boorigie's defense was that he did not commit the acts that constituted the crime.

The K.S.A. 60-455 evidence indicated that the defendant had a violent temper. It illustrated that the defendant had used his temper to control his spouses. As to the present crimes, we note that Jenell was manually strangled and that her death required at least several minutes of constant pressure around her neck. The several minutes required to effect strangulation supported a finding of premeditation. In addition, there was evidence that the defendant had attempted to kill Jenell at least twice in the 2 months preceding her death.

The jury was presented with two choices: the defendant was not guilty of premeditated murder and arson or the defendant was guilty of premeditated murder and arson. The trial court was correct—there was no evidence that the murder and arson was not a premeditated act, perpetrated for the purpose of financial gain.

### Cumulative Errors

Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Bedford,* 269 Kan. 315, 332-33, 7 P.3d 224 (2000).

Our review reveals no prejudicial trial errors. Therefore, the defendant's argument that he was denied a fair trial fails.

### Improper Sentencing

First, the defendant asserts that the Kansas hard 40 sentencing provision is constitutionally infirm under *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). The

defendant recognizes that we have previously held contrary to his assertion in *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000).

In Syl. ¶ 3 of *Conley*, the court stated:

"Imposition of the K.S.A. 21-4638 hard 40 sentence based on a fact not found by the jury does not increase a defendant's maximum sentence of imprisonment for life imposed under K.S.A. 21-4706(c). The hard 40 sentence limits the lower end of the sentence. Defendant's hard 40 sentence violates neither the Due Process Clause of the United States Constitution, nor his right to trial by jury under the 6th Amendment to the United States Constitution or § 5 of the Kansas Constitution Bill of Rights."

The defendant raises this claim to preserve that issue for federal review.

### Hard 40 Sentence

Next, the defendant contends that the evidence does not support the imposition of the hard 40 sentence.

The trial judge found the existence of two aggravating factors: (1) The defendant committed the crimes for the defendant's self or another for the purpose of receiving money or something of monetary value; and (2) the crime was committed in an especially heinous, atrocious, or cruel manner.

There is evidence that Boorigie was in a financial bind. A compliance investigator for the Department of Agriculture testified that for the period of 1989-1996, the defendant had been paid an average of $83,114 per year in insurance losses. He further testified that there were no payments made to Boorigie after 1995. A financial statement filed by the defendant in an unrelated child support case recited that Boorigie owed Jenell $217,000 for money that she had put into the farm. Katsy Cluck, who managed the Mullendore Ranch which Boorigie had farmed until 1998, testified that Boorigie had not paid her for all the grain he had harvested in 1997. The defendant had stated that the amount of wheat money that the alleged Bryan Treetop owed Jenell was $300,000.

The State presented evidence that Boorigie was the beneficiary of two life insurance policies on Jenell. Both were double indemnification policies and would pay double the face amount if Jenell's death was determined to be accidental. One policy was for

$300,000 and would pay $600,000 in the event of an accidental death; the other was for $400,000 and would pay $800,000 for an accidental death. A gas explosion or fire would be considered an accidental death.

After reviewing the evidence, the trial judge found no mitigating circumstances. He considered the fact that Boorigie had no prior criminal history as a mitigating factor, but rejected it because the defendant "had a course of conduct that raised questions, I think, in everybody's mind, including the jury's and myself about what was going on with him and things he was doing."

The evidence indicates that the defendant needed money and he stood to profit by at least $1,400,000 as a result of his wife's death. The evidence also strongly suggests that the defendant's lack of criminal history was the result of the defendant avoiding prosecution rather than the defendant's lack of criminal activity. We have previously noted that the existence of one aggravating circumstance may alone be sufficient to support the hard 40 where the mitigating circumstances are so weak that the one aggravating circumstance clearly outweighs them. *State v. Murillo,* 269 Kan. 281, 289, 7 P.3d 264 (2000). We find that the trial court did not err in imposing the hard 40 sentence.

Finally, Boorigie argues that the trial court erred in imposing an upward departure sentence for the arson conviction. The State concedes that pursuant to this court's holding in *State v. Gould,* 271 Kan. 394, 23 P.3d 801 (2001), an upward durational departure in a criminal sentence under K. S. A. 2001 Supp. 21-4716 is unconstitutional and must be reversed. We agree.

Defendant's convictions are affirmed. His upward durational departure sentence on the arson conviction is vacated, and the matter is remanded for resentencing.

DAVIS, J., not participating.

BRAZIL, S.J., assigned.