No. 90,954

STATE OF KANSAS, *Appellee,* v. THOMAS J. DRENNAN, JR.,
*Appellant.*
(101 P.3d 1218)

Opinion filed December 17, 2004.

*Cory D. Riddle,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: A jury convicted Thomas J. Drennan, Jr., of the first-degree murder of his girlfriend. The trial court sentenced

Drennan to a hard 50 life sentence. Drennan appeals his conviction and sentence, arguing the trial court erred in: (1) not giving instructions on lesser included offenses of reckless second-degree murder, voluntary manslaughter, and involuntary manslaughter; (2) admitting evidence of prior bad acts; (3) not suppressing evidence obtained after he was handcuffed, including his statements made before *Miranda* warnings, and evidence obtained after a warrantless entry into a home to check the welfare of a possible victim; (4) denying *Batson* challenges; and (5) imposing a hard 50 sentence.

*Facts*

At about 2:30 a.m. on August 19, 2002, Jason Levine was awakened by loud banging noises outside his house. Levine saw his neighbor's boyfriend, Thomas Drennan, outside and confronted him, asking him what was going on. Drennan told Levine to mind his own business and a verbal altercation ensued. While the men were arguing, Levine saw his neighbor, Shelbree Wilson, come out of her house. Shelbree told Drennan to "shut up and get back inside." Drennan then grabbed Shelbree by the shoulder and neck and pushed her back into the house. Levine heard Shelbree scream, heard "a little bit of a ruckus," and then silence. Levine called 911.

Officers Piner and McKee were dispatched to the scene at around 2:50 a.m. for a domestic violence disturbance. Officer Piner had responded to a prior domestic violence disturbance call at the same residence in June 2002, about 2 months earlier. During the investigation of that incident, Shelbree told Officer Piner she was afraid of Drennan and wanted him out of her life and her home but was not sure how to do that. Officer Piner told Shelbree she could apply for a protection from abuse (PFA) order.

When the officers arrived at the home on the night in question, they first spoke with Levine, who described what he had seen and heard. Officer Piner then went to the front door and knocked and rang the doorbell while Officer McKee went around to the side of the garage. Officer Piner received no response to her knocking and heard nothing, so she joined McKee. Through an open exterior

door into the garage, the officers then saw Drennan step out of the house and into the garage. The officers asked Drennan to step outside and speak with them, but Drennan was initially unresponsive. He seemed oblivious to the officers' presence. Drennan appeared very sweaty and was wearing only shorts, no shirt or shoes. When Drennan finally came outside, Officer McKee asked him what was going on and where his wife was. Again, Drennan did not respond. Drennan had a glazed-over look and appeared agitated; he also had an odor of alcohol about him.

Officer McKee asked Drennan to turn around so he could pat him down for weapons. Drennan was not cooperative and tried to pull away, so both officers physically restrained him and placed him in handcuffs. Officer McKee again asked Drennan where his wife was, and Drennan responded, "Fuck you," and, "I was going to give you some information, but now you'll just have to wait and see." When asked what he meant, Drennan said, "It will come out, it'll come out."

Officer Piner also asked Drennan where Shelbree was. Drennan told her, "She's not here." When the officer asked again, Drennan said he was not going to tell her. Officer Piner then called her sergeant and received permission to enter the house to check on Shelbree's welfare. She found Shelbree in a bedroom lying face down on the floor. Shelbree was unconscious but still breathing. Officer Piner saw that a cord from a floor fan was wrapped around Shelbree's neck with the plug end of the cord wrapped up in Shelbree's hair. In checking to make sure the cord was not choking her, Officer Piner found that Shelbree's fingers were wrapped around the cord.

Approximately 14 hours after she was admitted to the hospital, Shelbree was declared brain dead. Forensic pathologist Dr. Mary Dudley, who conducted the autopsy, testified that the cause of death was lack of oxygen to the brain due to strangulation. Shelbree had a variety of abrasions and contusions; some of her more serious injuries included multiple rib fractures, a small laceration of the liver, and hemorrhaging of the neck muscles. The left side of the hyoid bone (the bone above the Adam's apple) was fractured, a condition seen almost exclusively as a result of manual strangula-

tion. Shelbree also had bruising on her fingertips consistent with trying to pull a cord or ligature away from her neck. In Dr. Dudley's opinion, Shelbree died as a result of strangulation and that strangulation could have been a combination of ligature and manual strangulation. A ligature alone, however, would not have caused the fracture of the hyoid bone. Also, there were no ligature marks on Shelbree's neck. Dr. Dudley also testified that it would have taken at least 4 minutes of continuous pressure blocking blood and oxygen from reaching Shelbree's brain before brain death occurred. After 4 minutes, the damage was irreversible.

At trial, the State introduced evidence that Shelbree had obtained two prior PFA orders against Drennan in the months before the murder, although each had been later dismissed. In one of the supporting affidavits, Shelbree had alleged: "Tom Drennan put his hands around my neck to choke me Saturday night. He also told the neighbors that if they saw him walking out of the house with an axe and blood all over him that they were to call 911 because my body would be in the lake."

The State also called Stacy Barnes, a former girlfriend of Drennan's, who testified about an incident that had occurred when Drennan was living with her. Barnes testified that on January 22, 1999, Drennan attacked her during an argument. Drennan had two broken legs from an auto accident and was in a wheelchair, but he managed to push Barnes down on the bed and lay on top of her putting his hands on her face and neck. He squeezed Barnes' neck with one hand and covered her mouth and nose with the other so that she could not breathe. Drennan told Barnes over and over that he was going to kill her. He told her, "In about five seconds, you're going to be dead," and counted down the seconds. He told her to prepare to die and get ready to take her last breath. After about 5 to 7 minutes, Barnes was finally able to break free after striking Drennan over the head with a cordless phone. As a result of this incident, Drennan pled no contest to disorderly conduct in city court.

On the night of Drennan's arrest in this case, Drennan was interviewed by police and a videotape of that interview was played for the jury. In his statement to police, Drennan said that he and

Shelbree had been arguing and Shelbree had hit his back. Drennan said he and Shelbree began fighting and the fight moved into the bedroom. Drennan grabbed Shelbree around her chest from behind in an attempt to restrain her, and his hold slipped up to her throat area in what Drennan described as a "choke hold." The two rolled around on the bed, and Shelbree continued to try to hit Drennan. Drennan ran out of the room to get away from Shelbree, and when he went outside, the police had arrived.

At trial, Drennan testified that he could remember nothing of the fight with Shelbree because he was in an alcoholic blackout. Drennan explained that he had been using cocaine regularly, but could not find any cocaine on the day in question, so he drank more alcohol to compensate for the withdrawal symptoms he was experiencing. Drennan stated that he began drinking in the late afternoon hours and continued until around 1:30 a.m. A friend who gave Drennan a ride to Shelbree's home at that time described Drennan as extremely intoxicated, unsteady on his feet, and not very coherent.

### Did the Trial Court Err in Refusing to Instruct the Jury on the Lesser Included Offenses of Reckless Second-Degree Murder, Voluntary Manslaughter, and Involuntary Manslaughter?

Drennan was charged with first-degree premeditated murder. The trial court instructed the jury on that offense and on the lesser included offense of second-degree intentional murder. The court also instructed the jury that voluntary intoxication could be a defense to either first-degree or second-degree murder if the evidence showed that intoxication impaired Drennan's mental faculties to the extent he was incapable of forming the necessary state of mind of premeditation or the necessary intent to kill.

Drennan argues that the trial court denied him a fair trial when it refused to instruct on the lesser included offenses of reckless second-degree murder, voluntary manslaughter, and involuntary manslaughter. The record is not clear as to whether Drennan requested an instruction on voluntary manslaughter. During the instruction conference, defense counsel stated, "I'm not going to argue the voluntary manslaughter. We can't say, I think — based

on the evidence that we put forth that there's any evidence of a sudden quarrel or argument with the exception of, I would say just once again the video taped testimony that said we got into it, then just kind of ended there."

Where a defendant does not object to the giving of or failure to give a lesser included offense instruction, stating distinctly the matter to which he or she objects and the grounds of the objection, this court will find reversible error only if the giving of the instruction or the failure to give the instruction was clearly erroneous. See *State v. Evans*, 270 Kan. 585, 588, 17 P.3d 340 (2001); K.S.A. 2003 Supp. 22-3414(3). "Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *Evans*, 270 Kan. 585, Syl. ¶ 3.

In addition, Drennan's appellate brief mentions voluntary manslaughter only in the heading of an issue; he does not make any argument as to voluntary manslaughter in the substance of the brief. Rather, Drennan focuses on whether there was evidence that his behavior might have been reckless rather than intentional. An issue incidentally raised but not briefed may be considered abandoned. *State v. Hunt*, 275 Kan. 811, 821, 69 P.3d 571 (2003). Thus, Drennan failed to preserve the issue of whether the trial court erred when it did not give a lesser included offense instruction on voluntary manslaughter.

The record does reflect that during the instruction conference Drennan's counsel clearly requested instructions on the lesser included offenses of reckless second-degree murder and involuntary manslaughter. Drennan's appellate counsel suggests that trial counsel's remarks were also sufficient to preserve a request on voluntary manslaughter.

A trial court must instruct the jury on a lesser included offense "where there is some evidence which would reasonably justify a conviction" of the lesser offense. K.S.A. 2003 Supp. 22-3414(3). "If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive." *State v. Hoge*, 276 Kan. 801, 805, 80 P.3d

52 (2003). On review, the appellate court views the evidence in the light most favorable to the defendant. *State v. McClanahan,* 254 Kan. 104, 109, 865 P.2d 1021 (1993). "However, the duty to so instruct arises only where there is evidence supporting the lesser crime." *State v. Spry,* 266 Kan. 523, 528, 973 P.2d 783 (1999). An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. *Hoge,* 276 Kan. at 805.

Even if we consider counsel's ambiguous statements at the instruction conference as sufficient to preserve the issue of whether an instruction on voluntary manslaughter should have been given, there was no evidence to support the elements of that crime. At most, Drennan points to evidence that he and Shelbree were involved in some kind of struggle or altercation when she was killed. Voluntary manslaughter includes the intentional killing of a human being upon a sudden quarrel or in the heat of passion. K.S.A. 21-3403(a). However, to constitute voluntary manslaughter, the killing must have resulted from severe provocation. "The test for whether severe provocation exists is objective, and the provocation must be sufficient to cause an ordinary person to lose control of his or her actions or reason." *State v. Bell,* 266 Kan. 896, 918, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999). There was no evidence presented that Drennan was severely provoked; thus, the trial court's failure to instruct the jury on voluntary manslaughter was not error, much less clear error as is the standard since the instruction on voluntary manslaughter was not clearly requested.

Drennan did clearly preserve his request for instructions on reckless second-degree murder and involuntary manslaughter. However, the trial court determined there was no factual basis to support the element of recklessness and refused to give instructions on reckless second-degree murder and involuntary manslaughter. Specifically, the trial court ruled:

"On the issues of second degree reckless, involuntary manslaughter, I don't find that there is any factual basis to submit the issue of recklessness to the jury. On both cases, the evidence of ligature and/or manual strangulation in the time frame given by Dr. Dudley to cause the mechanism of irreversible brain death, I think she said four or more minutes, at least four minutes, in no way could equate to

reckless conduct. It had to be more than that. That the conduct is more than reckless conduct.

"In addition, the testimony of Mr. Drennan doesn't give me any factual foundation upon which to find any basis in the evidence to render to the jury the issue of reckless conduct. On that basis I'm not going to give the defense's requested instruction of second degree reckless or unintentional. Nor am I going to give the defense's requested involuntary manslaughter instruction."

The State relies primarily upon *State v. Jones*, 267 Kan. 627, 984 P.2d 132 (1999), in support of its argument that the evidence in this case excluded a theory of reckless murder as required for both second-degree murder and involuntary manslaughter. See K.S.A. 2003 Supp. 21-3402(b) (defining reckless second-degree murder, or "depraved heart" murder, as the killing of a human being committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life"); K.S.A. 2003 Supp. 21-3404 (defining involuntary manslaughter, as applicable to this case, as the unintentional killing of a human being committed recklessly).

The facts of *Jones* were similar to the facts in this case. In *Jones*, the defendant manually strangled the victim to death. The coroner testified it would have taken approximately 4 to 6 minutes for the victim to die. The defendant claimed he did not intend to kill the victim but that he had just "snapped." 267 Kan. at 633. Jones was charged with premeditated first-degree murder, and the trial court instructed the jury on the lesser included offenses of intentional second-degree murder, voluntary manslaughter, and involuntary manslaughter.

On appeal, Jones argued that the trial court erred in refusing to give an instruction on reckless second-degree murder. The court rejected Jones' argument, stating:

"When the evidence in this case is viewed in the light most favorable to defendant, as it must be on a question of instructing on lesser included offenses, it does not support an instruction on reckless second-degree murder. Jones told police that he killed Bagby when he threw her to the floor. His statement, however, cannot be reconciled with the autopsy results and the coroner's conclusion that her death was the result of manual strangulation, which took 4 to 6 minutes. Jones' self-serving statement is the only evidence that would tend to support an instruction on reckless second-degree murder. In light of all the other evidence, in particular

the objective findings of the pathologist, defendant's statement is insubstantial and insufficient to support a theory of unintentional killing. [Citation omitted.] All the other evidence excludes a theory of reckless second-degree murder. Bagby died when Jones used his hands to grip her neck hard enough to break pliable bone and cartilage structures and long enough—4 to 6 minutes—to fatally deprive her of oxygen. His actions were intentional and not reckless. Jones' self-serving statement does not support a reckless second-degree murder instruction. His conduct is indistinguishable from a defendant's action in pointing a gun at a victim and pulling the trigger, which is intentional rather than reckless conduct. [Citation omitted.] In *State v. Rupe*, 226 Kan. 474, 477-78, 601 P.2d 675 (1979), where defendant argued that his use of hands was 'insufficient to prove an intent to kill,' the court referred to strangulation as 'a most effective means of killing.' " 267 Kan. at 633.

Jones further argued that he was incapable of forming the intent to kill the victim because of his use of alcohol and cocaine. The court rejected this argument as follows:

"What Jones' argument does not take into account is that an intoxicated defendant's being incapable of forming the intent to kill does not transform his or her conduct into conduct so reckless in the circumstances as to manifest extreme indifference to the value of human life. In other words, intoxication can eliminate intent to kill so that the killing is unintentional under the law, but it may not supply the extreme recklessness element of unintentional second-degree murder. Thus, evidence of voluntary intoxication alone will not justify an instruction on reckless second-degree murder as a lesser offense of premeditated first-degree murder." 267 Kan. at 634.

Drennan argues that this case is factually distinguishable from *Jones* because *Jones* involved manual strangulation while, in this case, Drennan placed Shelbree in a "choke hold" from behind during a physical confrontation between them. Drennan contends a reasonable jury could have found that he recklessly choked Shelbree by attempting to restrain her in too aggressive a manner and by keeping her in the "choke hold" too forcefully and for too long. Drennan also argues a reasonable jury could have found that his intoxication impaired his judgment and caused him to act recklessly. Instead, because the jury was instructed only on first-degree premeditated murder and second-degree intentional murder, Drennan contends the jury was unfairly forced to either convict Drennan of intentional murder or acquit him.

Drennan's argument ignores some crucial facts, all of which point to intentional rather than reckless behavior. Shelbree was found with an electric cord around her neck; her fingers were bruised from trying to pull that cord away from her neck. Her injuries were consistent with a combination of manual and ligature strangulation. Furthermore, even accepting Drennan's version of the facts as true, placing someone in a "choke hold" with such force that it breaks the hyoid bone and causes hemorrhaging of the neck muscles and for such a length of time (at least 4 minutes) that blood and oxygen to the brain are cut off cannot be deemed anything but intentional behavior. Drennan's attempt to differentiate between a "choke hold" and manual strangulation is not convincing. This case cannot be distinguished from *Jones*. As in *Jones*, the trial court's refusal to give instructions based upon reckless rather than intentional behavior was not error.

### *Did the Trial Court Err in Admitting K.S.A. 60-455 Evidence of Drennan's Prior Violent Abuse of a Former Girlfriend?*

The State filed a pretrial motion to allow the introduction of K.S.A. 60-455 evidence of Drennan's prior attack on Stacy Barnes as relevant to prove intent. Although the trial court did not know what Drennan's defense was going to be, the court noted a possible defense was "that you didn't intend to strangle. That the strangling did occur, that it might have been something innocent gone bad." On that basis, the trial court granted the State's motion, finding that the incident with Barnes "does seem to directly impact on intent and premeditation." The trial court gave the appropriate limiting instruction, telling the jury it could consider evidence that Drennan had committed prior crimes only for the purpose of proving intent.

To admit other crimes evidence under K.S.A. 60-455, three requirements must be met. First, the evidence must be relevant to prove one of the facts listed in the statute; in this case, intent. Second, that fact must be a disputed, material fact. Third, the probative value of the evidence must outweigh its potential prejudicial effect. "If these requirements are met, the scope of appellate review is limited to whether the trial court abused its discretion.

[Citation omitted.]" *State v. Boorigie,* 273 Kan. 18, 34, 41 P.3d 764 (2002).

When admitting other crimes evidence to prove intent, the crucial distinction is not whether the crime is a specific or general intent crime, but whether the defendant has claimed his or her acts were innocent. "The relevancy of a prior conviction to the offense charged is linked to the similarity of the two offenses. *State v. Synoracki,* 253 Kan. 59, 71-72, 853 P.2d 24 (1993)." *State v. Gibson,* 30 Kan. App. 2d 937, 944, 52 P.3d 339, *rev. denied* 274 Kan. 1115 (2002).

Drennan argues that Stacy Barnes' testimony should not have been admitted because Drennan's criminal intent was not in question, evidence of his attack on Barnes had no probative value, and the extreme prejudice of Barnes' testimony outweighed any possible probative value. Drennan admitted responsibility for his actions which resulted in Shelbree's death, but claimed he could not remember those actions and was too intoxicated to have formed any intent to kill Shelbree. Thus, Drennan contends he never claimed his actions were innocent and the only contested issue was whether he was too intoxicated to form the intent to kill Shelbree. Drennan also points out that the trial court, in denying his request for lesser included offense instructions on reckless second-degree murder and involuntary manslaughter, determined that his actions could only have been intentional and not reckless; therefore, intent could not have been at issue.

Drennan misapprehends the meaning of the term "innocent" in this context. Drennan's actions were susceptible to several interpretations: He acted with premeditated intent to kill, with unpremeditated intent to kill, or with neither premeditation nor intent to kill because of his level of intoxication. Under the last interpretation, Drennan's actions would have been considered "innocent" in that the jury would have acquitted. In other words, by arguing he was incapable of forming the requisite intent due to his intoxication, Drennan placed his intent at issue.

Furthermore, even where there is no question that a murder was committed intentionally, the element of premeditation may still be substantially at issue. For example, in *State v. Henson,* 221

Kan. 635, 562 P.2d 51 (1977), the victim was murdered in a particularly brutal manner: the killer had slashed her throat back to the spinal cord and stabbed her repeatedly in and around the heart. Based upon this evidence, the court found there was no question of the perpetrator's intent to kill. Nonetheless, the court found that evidence of a previous knifing incident against a different victim was relevant to show both identity and "prior intent as related to premeditation." 221 Kan. at 645. Because of the similarity between the current and prior offense, the court found the evidence was admissible. 221 Kan. at 644-45. In the context of relevancy to prove intent, similarity is also important; however, "[p]roving intent does not require as much detailed similarity as proving identity." *State v. Synoracki*, 253 Kan. 59, 73, 853 P.2d 24 (1993).

In this case, there were striking similarities between the attack on Stacy Barnes and the murder of Shelbree Wilson. Drennan had been cohabiting with each of the women, each attack was precipitated by an argument, and each attack involved manual strangulation. Drennan's statements to Barnes that she should get ready to die and prepare to take her last breath showed that Drennan understood that squeezing the woman's neck could lead to her death. Thus, the evidence of the attack on Barnes was relevant to show Drennan's intent and premeditation in the murder of Shelbree Wilson.

Other cases have upheld the admission of prior crimes evidence under similar circumstances. See, *e.g.*, *State v. Boorigie*, 273 Kan. at 34-36 (evidence that defendant had committed violence against former wives was admissible to prove identity, intent, plan, and absence of mistake where murder victim had been married to defendant and died of manual strangulation and two former wives testified that when defendant became angry he would grab them around the neck and throw them); *State v. Lessley*, 271 Kan. 780, 793-94, 26 P.3d 620 (2001) (no abuse of discretion in admission of testimony of defendant's former wife that defendant was verbally abusive to her when angry, and on two occasions was physically abusive to her, as evidence relevant to issues of motive and intent during prosecution in which defendant was charged with murder-

ing his former girlfriend after she attempted to end their relationship).

The trial court did not abuse its discretion in admitting evidence of Drennan's prior attack on Stacy Barnes.

### Did the Trial Court Err in Refusing to Suppress Evidence Obtained as the Result of an Illegal Search of Drennan's Home As Well As Drennan's Statement During Interrogation?

Drennan filed a pretrial motion to suppress any evidence obtained as the result of the allegedly illegal entry into his home, as well as statements he made to police outside the home and before he was read *Miranda* warnings. For the first time on appeal, Drennan also argues that the trial court should have suppressed the statements he made during the interrogation at the police station as "fruit of the poisonous tree."

### Officer's Warrantless Entry into Residence

The trial court denied Drennan's motion to suppress, ruling that Officer Piner's entry into the residence was justified by the emergency doctrine exception to the warrant requirement.

Drennan takes issue with the trial court's findings. On a motion to suppress evidence, this court reviews the facts underlying the trial court's suppression decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. Although the court does not reweigh the evidence, the ultimate determination of suppression is a legal question requiring independent determination. *State v. Mendez*, 275 Kan. 412, 416, 66 P.3d 811 (2003).

A search conducted without a warrant is per se unreasonable unless it meets one of several recognized exceptions to the warrant requirement: " 'consent; search incident to a lawful arrest; stop and frisk; probable cause to search accompanied by exigent circumstances, of which hot pursuit is one example; the emergency doctrine; inventory searches; plain view; and administrative searches of closely regulated businesses.' [Citations omitted.]" *Mendez*, 275 Kan. at 420-21 (quoting *State v. Baughman*, 29 Kan. App. 2d 812, 814, 32 P.3d 199 [2001]). The rationale of the emergency doctrine

exception was explained by the United States Supreme Court in *Mincey v. Arizona*, 437 U.S. 385, 392, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978):

"We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. . . . 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' [Citation omitted]."

In *Mendez*, this court reiterated the three-part test for determining if the emergency doctrine applies:

" ' "(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

" ' "(2) The search must not be primarily motivated by intent to arrest and seize evidence.

" ' "(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." [Citation omitted.]' ". *Mendez*, 275 Kan. at 425 (quoting *State v. Jones*, 24 Kan. App. 2d 405, 413, 947 P.2d 1030 [1997]).

The State has the burden of satisfying each element. *State v. Horn*, 278 Kan. 24, 32, 91 P.3d 517 (2004). The reasonableness of the officer's belief is determined by an objective standard, *i.e.*, whether there is evidence which would lead a prudent and reasonable officer to see a need to act. *Horn*, 278 Kan. at 32-33.

In *Horn*, we applied the three-part test to facts where police responded to a 911 call from a woman who was concerned about the welfare of her 89-year-old neighbor who had not followed her routine for a couple of days. The defendant, who lived with the 89-year-old woman, had also deviated from typical practice by not allowing the neighbors to visit. When police knocked, the defendant responded verbally but refused to open the door. After the defendant stalled for several minutes, the police officers turned the door knob and pushed the door open, which exposed a body to plain view. The court concluded that under these circumstances the three-part test set forth in *Mendez* was satisfied.

Similarly, the trial court correctly concluded that under the facts of this case the emergency doctrine applied and the evidence obtained upon entry into the home need not be suppressed.

The first factor is whether the officers had reasonable grounds to believe there was an emergency and that Shelbree was in need of their assistance for protection of her welfare. Drennan contends that it was unreasonable for Officer Piner to believe Shelbree was in need of assistance for health and safety reasons when Drennan was already in custody. He also points out that the neighbor did not tell the officers that he had actually seen Shelbree outside the house. According to Drennan, a reasonable person would have called into the house for Shelbree before entering or would have sought a warrant. These arguments are not persuasive.

The officers knew that there was a prior history of domestic violence between Drennan and Shelbree; that Drennan had been involved in a verbal altercation with a neighbor prior to the officers' arrival; that the same neighbor had heard an argument, a woman's scream, and then silence; that no one had responded when Officer Piner knocked at the door and rang the doorbell; that Drennan appeared sweaty and agitated and was unresponsive to the officers' questions; and that Drennan had refused to tell them where Shelbree was. These facts were sufficient to establish a reasonable belief that there was an emergency and that Shelbree was in need of assistance.

The second factor is whether Officer Piner's entry into the house was motivated by any intent to arrest or seize evidence. Clearly, it was not. Officer Piner testified that she entered the house because she was concerned for Shelbree's welfare and that she did not seize anything from the home. Drennan does not contest this point.

The third factor is whether the officers had reasonable grounds to believe Shelbree was located inside the residence. Again, Drennan does not contest this point. The officers knew Shelbree lived at the residence, and the neighbor told them he had heard an argument and a woman's scream inside the home. These facts provided a reasonable basis for the officers to believe Shelbree was located inside the home.

Because Officer Piner's warrantless entry into the home was permissible under the emergency doctrine, there is no need to address Drennan's argument that his statements to police during the interview at the police station should have been suppressed as fruit of the poisonous tree.

### Statements Made to Police Before Miranda Warnings

The trial court also ruled that the officers' request to pat down Drennan for weapons was reasonable and that Drennan's evasive maneuvering justified the officers' placing Drennan in handcuffs to protect their own physical safety. The court found the officers' questions were investigatory in nature, and even though Drennan was in handcuffs, the situation remained investigatory and not custodial. The court also ruled that Drennan's pre-*Miranda* statements to the officers were admissible because the officers' questions were permissible under the public safety exception outlined in *State v. McKessor*, 246 Kan. 1, 7, 785 P.2d 1332, *cert. denied* 495 U.S. 937 (1990).

Drennan argues that he was in custody and that the officers' questions constituted interrogation; therefore, there is a presumption that his responses to those questions were compelled. However, even assuming that Drennan was in custody, he has failed to address the public safety exception.

In *New York v. Quarles*, 467 U.S. 649, 655-56, 81 L. Ed. 2d 550, 104 S. Ct. 2626 (1984), the United States Supreme Court held that there is a " 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved." Quarles, who had reportedly just raped a woman and was carrying a gun, was pursued by police officers into a supermarket. When officers handcuffed Quarles, they saw that his shoulder holster was empty. Police asked Quarles where the gun was, and Quarles replied "the gun is over there." 467 U.S. at 652. The trial court excluded that statement, the gun, and subsequent statements because officers had failed to give *Miranda* warnings before asking Quarles about the gun. The Supreme Court described the situation

as a "kaleidoscopic situation . . . where spontaneity rather than adherence to a police manual is necessarily the order of the day," because the gun, with its actual whereabouts unknown, posed more than one danger to public safety. 467 U.S. at 656.

This court adopted that rationale in *McKessor,* the case relied upon by the trial court in this case. In *McKessor,* the defendant was apprehended at a motel. Police believed him to be armed, knew the adjoining motel rooms were occupied, and were told by McKessor that another man was in the bathroom. When officers entered the motel room they asked McKessor the location of his gun. Relying upon *Quarles,* the court determined the police acted in the interest of public safety when determining the location of weapons in the room. The court stated:

"Certain situations pose a threat to the public safety which outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. Police officers should not be placed in the untenable position of having to consider, often in a [matter] of seconds, whether it best serves society for them to ask the necessary questions with the *Miranda* warning in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them." 246 Kan. 1, Syl. ¶ 2.

Although the officers' concern in this case was not for the general public's safety, as was the situation in *Quarles* and *McKessor,* it was for the safety of a possible victim, Shelbree. Several cases have extended *Quarles* under such circumstances. See *United States v. Padilla,* 819 F.2d 952 (10th Cir. 1987) (armed suspect's response to pre-*Miranda* questions, stating he "shot someone inside the house," held admissible); *Smith v. State,* 646 So. 2d 704, 708 (Ala. Crim. App. 1994) (suspect's response when officer asked whether suspect had been shot held admissible); *State v. Ramirez,* 178 Ariz. 116, 871 P.2d 237 (1994), *cert. denied* 513 U.S. 968 (1994) (suspect's response to officer's pre-*Miranda* questions as to the condition of others at the scene held admissible); *Bailey v. State,* 763 N.E.2d 998, 1001-02 (Ind. 2002) (suspect's pre-*Miranda* statement regarding location of additional victim held admissible); *State v. White,* 619 A.2d 92, 94 (Me. 1993) (suspect's response to officer's pre-*Miranda* questions about the location of a victim held admis-

sible); *State v. Orso,* 789 S.W.2d 177, 180, 184-85 (Mo. App. 1990), *cert. denied* 499 U.S. 951 (1991) (suspect's response to pre-*Miranda* question as to the location of a potential victim held admissible). In this case, where the officers had a reasonable belief that Shelbree might be in danger and in need of their assistance, they were justified in asking Drennan about Shelbree's whereabouts before reading him his *Miranda* rights. The trial court did not err in denying Drennan's motion to suppress.

### Did the Trial Court Err in Overruling Drennan's Objection When the State Struck an African-American From the Jury Panel in Violation of Batson v. Kentucky?

Drennan objected to the State's peremptory strike of an African-American woman from the jury panel. The trial court asked the State for a race-neutral explanation for the strike and found that explanation to be satisfactory. At that time, Drennan also informed the court that the State had already struck the only other two minority members of the jury panel. The trial court initially found that Drennan had waived his objections to those two previous strikes by failing to object, but after trial upon Drennan's motion for a directed verdict, the trial court reconsidered its decision and ruled that Drennan had not waived his objections. The trial court then conducted the hearing required by *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). Although the court found that Drennan had failed to make a prima facie showing that the State had made the strikes of two of the panel members on the basis of race, the court allowed the State to give a race-neutral explanation for the strikes. The court then found that Drennan had failed to carry his burden of establishing purposeful discrimination.

The standard of review where a *Batson* challenge is involved was recently stated in *State v. Washington,* 275 Kan. 644, Syl. ¶¶ 1-3, 68 P.3d 134 (2003):

"In reviewing a challenge under *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, (1986), concerning the State's use of a peremptory challenge, the applicable appellate standard of review is whether the trial court abused its discretion in determining if the challenged strikes were constitutionally per-

missible. Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner, or in other words, when no reasonable person would take the view adopted by the trial court."

"The *Batson* analysis involves a three-step process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. In this second step, the prosecutor is only required to put forth a facially valid reason for exercising a peremptory strike to satisfy the second step of the *Batson* analysis. Finally, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination."

"On appeal, the reviewing court is required to accept as true the statements of fact given by the prosecutor for purposes of determining whether the prosecutor gave race-neutral reasons for the strike if the defendant failed to object to the statement."

Where, as here, the trial court has ruled on the ultimate question of discrimination, the preliminary issue of whether the defendant made a prima facie showing of discrimination becomes moot. See *State v. Douglas*, 274 Kan. 96, 102, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003).

The State explained its peremptory strikes on the basis that one person, a widow and Cessna worker, frowned during the entire jury selection process. The second person was an instrument technician at Mid-Continent Instrument, which as the prosecutor explained, is "a profession that required precision, and those types of professions are sometimes difficult for the State, and in moving forward in a case where we are looking at reasonable doubt as opposed to a hundred percent accuracy. And he was struck on that basis." As to the last of the three panel members at issue, the State gave the following explanation:

"[T]he State did ask [the panel member] questions concerning her use of alcohol, and the responses, her body language and her response required her, indicated to us that she might be somewhat protective of an individual who was a drinker or an enabler, and for that reason, for that reading made by the State, it was why we struck her."

The record reflects that, when asked about having experience with persons who are alcoholics, the panel member responded, "I hang around with my family, but they drink and I don't—I just—I'm

their chauffeur. I don't like them drinking. If they drink, I like to protect them so I go with them where ever they have to go."

With regard to the second step of the *Batson* analysis, the State's race-neutral explanation need not be persuasive or even plausible, it need only be facially valid. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Washington*, 275 Kan. at 654.

There is no discriminatory intent inherent in the State's explanations for striking the three minority persons from the jury panel. While some of the explanations do not seem particularly compelling, that is not the test. The State's explanations were at least facially valid; thus, the trial court did not abuse its discretion in finding that Drennan failed to prove purposeful discrimination.

### *Did Cumulative Errors Deny Drennan a Fair Trial?*

Drennan argues that the cumulative effect of multiple errors denied him a fair trial. Multiple trial errors may require reversal of a defendant's conviction if the cumulative effect of the errors substantially prejudiced the defendant and denied him or her a fair trial. *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 (1992). However, since we have found no error, there is no merit to this issue.

### *Did the Trial Court Err in Sentencing Drennan to a Hard 50 Life Sentence?*

Drennan next challenges the trial court's imposition of a hard 50 life sentence. Drennan contends that the district court erred in finding the existence of the aggravating circumstance that the killing was committed in an especially heinous, atrocious, or cruel manner; in finding that Drennan's alcoholism and the information in a report prepared by a mitigation expert and relating to Drennan's social history, his family's history of alcoholism, and Drennan's alcoholism (hereinafter referred to as "alcohol statement") were not mitigating circumstances; and in failing to find that the mitigating circumstances outweighed the aggravating circumstances.

As relevant to this case, K.S.A. 2003 Supp. 21-4636(f) provides, for purposes of the hard 50 sentencing scheme, one aggravating circumstance is that "[t]he defendant committed the crime in an especially heinous, atrocious or cruel manner." K.S.A. 2003 Supp. 21-4636(f)(1), (3), and (5), list the following conduct by the defendant as sufficient to establish an aggravating circumstance: prior stalking of or criminal threats to the victim; infliction of mental anguish or physical abuse before the victim's death; or continuous acts of violence begun before or continuing after the killing.

In support of its decision to impose a hard 50 life sentence, the trial court made the following findings:

"The Court finds pursuant to K.S.A. 21-4636, Mr. Drennan committed this crime in an especially heinous, atrocious and cruel manner.

"1. Under 21-4636(f)(1), two (2) P.F.A. cases were filed as shown by State's Exhibits 41 and 42 which were produced by evidence during the trial. The affidavit in case 2002D3089 dated 6/18/02 and case 2020D3651 dated 7/18/02 and the testimony to support those statements at trial from other witnesses establish prior stalking of or criminal threats to the victim under 21-4626(f)(1).

"2. Under 21-4636(f)(3), the Court finds by a preponderance of the evidence that the evidence at trial shows infliction of physical abuse before Shelbree Wilson's death on August 19, 2002. The extent of the physical injuries, bruises, cuts, scrapes, lacerations, broken ribs and injuries to the fingers did not occur in a moment's time. Those occurred over a period of time. The Court also finds that relative to 21-4636(f)(3) these acts caused infliction of mental anguish on Shelbree Wilson by Thomas Drennan.

"3. Under 21-4636(f)(5), the Court finds there were continuous acts of violence begun before the killing of Shelbree Wilson on August 19, 2002, by Thomas Drennan. The Court finds the evidence establishes, specifically through Dr. Dudley's testimony, that strangulation took four minutes and by the evidence of the placement of the electrical cord to the fan as testified to by Officer Piner, that Shelbree Wilson was aware of her fate and aware of her impending death. The Court also finds by a preponderance of the evidence that on August 19, 2002, Shelbree Wilson [experienced] conscious pain and suffering as a result of the physical trauma that resulted in her ultimate death.

"The Court finds all three aggravating factors as alleged by the State have been met and have been supported by substantial evidence. The Court does not find defendant's alcoholism or alcohol statement as a mitigating circumstance. The Court considers the criminal history and efforts at rehabilitation of the defendant. The Court finds that the aggravating factors are not outweighed by the mitigating factors."

### Aggravating Circumstances

First, Drennan contends the trial court erred in finding the existence of the aggravating circumstance that Drennan killed Shelbree in an especially heinous, atrocious, or cruel manner. Where a defendant challenges the sufficiency of the evidence for establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding, the standard of review is " 'whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence.' [Citations omitted.]" *State v. Boldridge*, 274 Kan. 795, 808, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003).

The trial court found that Drennan's prior stalking of and criminal threats to Shelbree were established through evidence of two prior protection from abuse (PFA) orders obtained by Shelbree against Drennan. In the petitions for those PFA orders, Shelbree alleged that Drennan had intentionally caused her physical harm or attempted to do so, that Drennan had placed her in fear of imminent bodily harm by physical threat, and that Drennan had constantly threatened to " 'throw me under the bus' " and take possession of her new house. In the supporting affidavits for the PFA orders, Shelbree alleged that Drennan had put his hands around her neck and tried to choke her; that Drennan had told the neighbors if they saw him walking out of the house with an axe and blood all over him, they should call 911 because Shelbree's body would be in the lake; that Drennan had lied to police about Shelbree scratching him, which resulted in her arrest; that Drennan had blackmailed Shelbree into dropping the first PFA order by saying he would not tell the truth at court; that Drennan had locked Shelbree out of her house at 3 a.m. when she was in her nightgown; and that Shelbree was in fear for her life.

Drennan argues these facts were insufficient to establish that he stalked or made criminal threats to Shelbree because he made the comments about throwing Shelbree's body in the lake to the neighbors and not directly to Shelbree. Drennan ignores the remaining facts contained in the PFA documents. When viewed in the light

most favorable to the State, a reasonable factfinder could have found by a preponderance of the evidence that Drennan stalked or made criminal threats to Shelbree.

The trial court also found that Drennan inflicted mental anguish or physical abuse on Shelbree before her death. Dr. Dudley testified that Shelbree suffered a variety of injuries including blunt trauma to her head, chest, and abdomen; multiple rib. fractures; a laceration of the liver; and bruising of the upper and lower extremities. The left side of Shelbree's hyoid bone was fractured, and she had bruising on her fingertips consistent with trying to pull a cord or ligature away from her neck. The trial court noted that all of these injuries could not have been inflicted in an instant, and must have occurred over a period of time before Shelbree actually died.

Finally, the trial court found there were continuous acts of violence begun before the killing of Shelbree, as evidenced by Dr. Dudley's testimony that it would have taken at least 4 minutes of continuous pressure on Shelbree's neck before she experienced brain death and the fact that an electric cord had been wrapped around her neck. The court also found Shelbree experienced conscious pain and suffering during these events.

Drennan admits that he killed Shelbree in a heinous, atrocious, or cruel manner but argues that he did not kill her in an *especially* heinous, atrocious, or cruel manner as required by K.S.A. 2003 Supp. 21-4636(f). This argument is not convincing. The trial court's findings that Drennan inflicted mental anguish and physical abuse on Shelbree through continuous acts of violence before killing her are amply supported by the record. A rational factfinder could easily have made the same findings as did the trial court based upon a preponderance of the evidence.

## Mitigating Circumstances

Next, Drennan argues the trial court erred in finding that his alcoholism and alcohol statement were not mitigating circumstances. Where a defendant challenges a trial court's refusal to find a mitigating circumstance, the standard of review is " 'whether, after a review of all the evidence, viewed in a light most favorable to the defendant, a rational factfinder could have found by a pre-

ponderance of the evidence the existence of the mitigating circumstance.' [Citation omitted.]" *Boldridge*, 274 Kan. at 809. However, where a mitigating circumstance is not enumerated in the statute, a trial court's decision that such a circumstance is not truly a mitigating circumstance is within the trial court's discretion and will not be disturbed on appeal absent an abuse of discretion. *State v. Livingston*, 272 Kan. 853, 858, 35 P.3d 918 (2001).

At his sentencing hearing, Drennan argued several factors as mitigating circumstances: that his defense was not without merit; that he was impaired from drinking at the time of the incident and had no memory of it; that he suffered from alcoholism and drug abuse; that he had reaffirmed his religious faith and was making efforts toward rehabilitation; that he had expressed remorse; and that he had no significant criminal history. Drennan also provided the trial court with a lengthy mitigation report detailing his family's history of alcoholism and addiction and how his own alcoholism and addiction had affected his life and contributed to his murder of Shelbree.

With regard to his abuse of alcohol, Drennan argued his intoxication on the night of the murder fell under K.S.A. 21-4637(b) and (f), relating to a defendant's being under the influence of extreme mental or emotional disturbance and a defendant's capacity to appreciate the criminality of his or her conduct.

The trial court made the following findings regarding the mitigating circumstances argued by Drennan:

"Concerning the mitigating factors argued by the defense, one of the arguments is that Mr. Drennan does not have a significant criminal history. He has nine prior convictions. Five of them involve alcohol or four of them concern alcohol, one concerns drugs. Three are disorderly conducts. It is not much of a stretch of imagination with Mr. Drennan's history, especially concerning the information provided in the mitigation report, to believe that every one of those incidents resulted from an excess of either drugs and/or alcohol. Mr. Drennan has a history documented in both the testimony at trial and by documentation provided to me in the mitigation report of having a history of using alcohol and/or drugs or the combination of both to excess. And that he has a history, he claims, of blackouts. And that during these periods of blackout in his history, he's done things he does not remember. Some of those things have been violent, some of those things have been inappropriate.

"The history of Mr. Drennan is replete with these types of incidents and I must say that despite the fact you have had repeated incidents of drinking to extreme where you claimed to have a blackout and then do things which you do not remember, you continued that pattern of behavior. Claims that you did not know what you were doing on August 19 of 2002, belies the entire history leading up to that point where time and time and time again, you've had that type of conduct where you consumed alcohol and were doing something to excess, claimed to have such blackouts. You have done things that you are sorry that you have done, and yet you repeat that behavior time and time and time again over the course of your life therein.

"The contention—I cannot find your alcoholism or your alcohol statement, to whatever degree it may have actually existed on August 19, 2002, as a—as a mitigating circumstance. The jury was presented with instructions on both offenses with which you were charged. The defense or the instruction of voluntary intoxication, by virtue of the jury's verdict of guilty of premeditated first-degree murder, they discounted the testimony, they discounted that argument, they discounted that defense."

The court went on to note that Drennan's efforts at rehabilitation had all taken place since he had been in jail, thus the court took those efforts "with a grain of salt." The court concluded, "For whatever effect these mitigating factors and circumstances have, I find that the aggravating factors are not outweighed by the mitigating factors."

On appeal, Drennan argues no reasonable person could have concluded that his alcoholism and alcohol statement did not constitute mitigating circumstances. However, Drennan does not argue that his alcoholism or alcohol statement fall under any of the mitigating circumstances listed at K.S.A. 21-4637. Where a mitigating circumstance is not listed in the statute, this court reviews a trial court's refusal to find such a mitigating circumstance under an abuse of discretion standard. See *State v. Livingston*, 272 Kan. at 858.

A review of the sentencing transcript shows that, while the trial court stated it could not find Drennan's alcoholism or alcohol statement to be a mitigating circumstance, the trial court did consider Drennan's evidence relating to alcohol abuse; it simply did not find Drennan's argument on this point to be persuasive. The trial court discussed Drennan's history of alcohol abuse and alcohol-related criminal convictions as evidence that, in spite of many previous

problems as a result of alcohol, Drennan had failed to change his behavior. Furthermore, the fact that Drennan had no memory of his crime due to an alcoholic blackout seems a weak mitigating factor in comparison to the aggravating factors found to exist in this case. Drennan has failed to establish that the trial court abused its discretion in failing to find his alcoholism and alcohol report as mitigating circumstances.

On the other hand, Drennan's alcohol statement encompasses the argument that his intoxication on the night of the murder was a mitigating factor, and Drennan's intoxication could theoretically be construed as falling under K.S.A. 21-4637(b) (defendant under influence of extreme mental or emotional disturbance) or (f) (defendant lacked capacity to appreciate the criminality of his or her conduct). See *State v. Murillo*, 269 Kan. 281, 289, 7 P.3d 264 (2000) (recognizing that evidence a defendant was under the influence of crack cocaine could constitute mitigating circumstances of extreme mental or emotional disturbance and lack of capacity to understand the criminality of one's conduct, but finding this mitigating factors were outweighed by aggravating factor of previous felony conviction involving infliction of great bodily harm).

After examining the evidence in the light most favorable to Drennan, it is difficult to conclude that a rational factfinder could have found by a preponderance of the evidence that, because of his intoxication, Drennan was under the influence of an extreme mental or emotional disturbance or that he lacked the capacity to understand the criminality of his conduct. See *Boldridge*, 274 Kan. at 809. As noted by the trial court, the jury had already rejected Drennan's voluntary intoxication defense and found that Drennan's intoxication did not render him incapable of premeditating or forming the requisite intent to kill Shelbree. Thus, the trial court did not err in refusing to consider Drennan's intoxication as a mitigating circumstance.

### *Weighing of Aggravating and Mitigating Factors*

Drennan also argues that the trial court erred in failing to find that the mitigating circumstances outweighed the aggravating circumstances. The trial court's weighing of aggravating and mitigat-

ing circumstances is within its sound discretion and will not be disturbed on appeal absent an abuse of discretion. *State v. Lopez*, 271 Kan. 119, 141-42, 22 P.3d 1040 (2001).

As discussed above, the trial court gave a thorough explanation on the record of its consideration of the aggravating and mitigating circumstances. Although the court considered Drennan's alcohol-related arguments, it did not find them persuasive given Drennan's long history of failing to address his alcohol-related problems. The trial court's reasoning does not reflect an abuse of discretion. Drennan's argument to the contrary is rejected.

*Is the Kansas Hard 50 Sentencing Scheme*
*Unconstitutional Because it Allows a Defendant's Sentence to be*
*Increased Beyond the Maximum Guidelines Penalty Based Upon*
*Facts not Proven to a Jury Beyond a Reasonable Doubt?*

Drennan's final argument is that the Kansas hard 50 sentencing scheme is unconstitutional because it does not afford criminal defendants their right to have a jury determine beyond a reasonable doubt all facts which might increase the maximum penalty for first-degree murder. Drennan recognizes that this court has already rejected this argument but raises the issue to preserve it for federal review.

This court held that the hard 50 sentencing scheme is constitutional in *State v. Douglas*, 274 Kan. 96, 111, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003). The court reaffirmed that ruling in *Boldridge*, 274 Kan. 795, and *State v. Hebert*, 277 Kan. 61, 82 P.3d 470 (2004). Drennan has cited no new authority postdating those cases which might convince this court to alter its position. In *State v. Hurt*, 278 Kan. 676, 101 P.3d 1249 (2004), we have considered the impact of the recent United States Supreme Court decision in *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004), and determined that decision does not affect this court's analysis that exposing a defendant to a later parole eligibility based upon a judge's factual finding only limits the lower end of the sentence and is not the equivalent of exposing a defendant to an increased maximum penalty.

Affirmed.

NUSS, J., not participating.