No. 85,197

STATE OF KANSAS, *Appellee*, v. JOHN S. HERMOSILLO, *Appellant*.

(35 P.3d 833)

Opinion filed December 7, 2001.

*Janine Cox*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Matthew T. Treaster*, special prosecutor, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

Six, J.: Defendant John Hermosillo appeals his convictions for one count of first-degree premeditated murder and four counts of forgery. K.S.A. 21-3401(a); K.S.A. 21-3710(a). Hermosillo was sentenced to a controlling sentence of life with no possibility of parole for 25 years.

We consider Hermosillo's claims of: (1) insufficient evidence to support his conviction for first-degree premeditated murder, (2) error in failing to instruct the jury on second-degree intentional murder, (3) error in denying his motion to suppress statements made during a custodial interrogation, and (4) prosecutorial misconduct.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (appeal of a conviction resulting in an off-grid crime receives review by this court).

Finding no error, we affirm.

## FACTS

On April 23, 1999, workers for Friendship Meals, when attempting to deliver lunch, discovered John Keeley's body in his apartment in Lyons, Kansas. Keeley was sitting in his recliner in the living room. The television was on. Lyons Police responded to a

911 emergency call. Initially, the officers did not suspect that a criminal act had occurred. Upon examination of the body, the county coroner found bread and ham in Keeley's mouth and some food particles on his mouth, chin, and neck. The coroner concluded that Keeley had died of suffocation by choking on the food. The body was sent to the local mortuary and embalmed for funeral preparation. After officers were informed by an anonymous call that foul play might be involved, an autopsy was ordered.

Keeley lived in a main floor apartment. Hermosillo lived below in a basement apartment. Within hours of Keeley's death, Hermosillo told his friend Danny Alvarado that "he did it." Alvarado did not know what Hermosillo was talking about. Although surprised about what he was hearing, Alvarado had previously heard Hermosillo talk about his intentions to kill Keeley. Alvarado told a friend, Rita Corbin, of Hermosillo's talking about killing Keeley. Corbin testified:

"[CORBIN]: Well, it was about a week to two weeks before Mr. Keeley died, and . . . Danny [Alvarado] told me that Mr. Hermosillo had been talking about killing [Keeley].

"[THE PROSECUTOR]: Did Mr. Alvarado elaborate on any of that?

"[CORBIN]: Some, something about money, because the way I took it was that Hermosillo wanted Danny to be involved in it and Danny had told him that he wouldn't kill anybody for money."

On April 23, Alvarado and Hermosillo drove around town so that Hermosillo could be seen by the "cops." During their drive, Hermosillo explained to Alvarado how he had killed Keeley. He said he watched Keeley sleep, shoved a sandwich in his mouth, sat on his chest, and smothered him. At trial, Alvarado testified that Hermosillo said he had laid on top of Keeley with a pillow. Later, Hermosillo told three other friends that he had killed Keeley. After explaining to Rita Corbin that he had put a sandwich in Keeley's mouth and a pillow over his face, Hermosillo said "he was just joking." Dougan thought Hermosillo was drunk when he told Dougan of killing Keeley with a sandwich and pillow. Janice Dougan did not take Hermosillo seriously when he told her, the day after

Keeley's death, that he had killed Keeley. She testified that "it was like he was joking."

On the afternoon of April 23, Hermosillo spoke with his neighbor Brenda Tucker. Hermosillo said he had heard that Keeley was taken to the hospital. He asked Tucker how Keeley was doing. When Tucker told him that Keeley had died the night before, Hermosillo looked surprised. According to Hermosillo, Keeley had stomped on the floor around 2 or 2:30 a.m. Hermosillo had gone upstairs to Keeley's apartment. Keeley said he was hungry, and Hermosillo fixed him a TV dinner and gave him a sandwich.

Hermosillo's use of Keeley's personal checks was discovered during the investigation. Dougan testified that Hermosillo took checks from Keeley, handed them to Dougan, and then Hermosillo and Dougan would take the checks to nearby Sterling, Kansas, to cash them at a grocery store. Hermosillo and Dougan would split the money. Alvarado also testified that Hermosillo was "borrowing" money from Keeley and cashed a check from Keeley's account at a bank in Sterling.

Following his arrest, Hermosillo was interviewed by two officers. Before the interview, he was given *Miranda* warnings. He waived his rights and agreed to talk to the officers. When the police asked Hermosillo about forging checks, he denied committing forgery. He said he had received one check from Keeley and thought his friends Alvarado and Dougan had each been given a Keeley check. He said Keeley let him borrow the money. Five out of six checks contained Hermosillo's fingerprints; Keeley's fingerprints were not found on the checks.

During his interview by the officers, which lasted about 3 hours, Hermosillo provided inconsistent statements and changed his story repeatedly. He first said that at 10 p.m. on April 22 he went upstairs to Keeley's apartment and made Keeley a TV dinner. He said he returned to his apartment, and Keeley pounded on the floor, so he went back upstairs. Keeley asked for water and said he was still hungry. Hermosillo said Keeley did not want another TV dinner, so he went downstairs to get the half of a sandwich he had not eaten and gave it to Keeley. Later, Hermosillo changed his story by saying he heard Keeley coughing and wiggling around. When

he went upstairs, he thought Keeley was asleep, but "he [Keeley] looked weird." Hermosillo continued to change his story. He said he went upstairs, saw Keeley was asleep, touched him and yelled at him. Then he told officers that he went upstairs and found Keeley dead. At trial, the taped interview was played for the jury.

## DISCUSSION

### Sufficiency of Evidence

We first take up Hermosillo's insufficiency of the evidence claim. Our standard of review is whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found Hermosillo guilty of premeditated murder beyond a reasonable doubt. See *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999).

The State introduced no evidence of a struggle, strangulation, or cuts and bruises. However, the evidence showed that Keeley was in poor health. He suffered from malnutrition, alcoholism, alcoholic cirrhosis, anemia, and atria fibrillation or rapid heartbeat. When Alvarado was asked whether Hermosillo said Keeley was able to fight during the killing, Alvarado responded, "No, [Keeley] didn't struggle very much." Forensic evidence showed that Keeley died of asphyxiation secondary to obstruction of the airway.

Circumstances that may lead to an inference of premeditation include: "(1) the nature of the weapon used, (2) a lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and/or declarations made by the defendant before and after the killing, and (5) lethal blows inflicted after the deceased was felled and rendered helpless." *State v. Jamison*, 269 Kan. 564, 572, 7 P.3d 1204 (2000).

Hermosillo points out that during closing arguments, the prosecutor argued that James Dougan and Alvarado testified that he "told them that he had plans to kill Mr. Keeley." He notes that Dougan's testimony did not rise to that level of certainty. When asked if Hermosillo had ever talked to him about killing Keeley before Keeley's death, Dougan said there might have been a time, but he was not "sure on exact date or what." When asked if Hermosillo told him that he had thought about killing Keeley because

Keeley was "loaded," Dougan said he was not sure. When asked if he remembered a conversation of this nature, Dougan said, "There might have been a time, but I'm not positive." Dougan suggested during his interview with police that Hermosillo told him he wanted to kill Keeley because Keeley was "loaded."

The record shows that Hermosillo told Alvarado that he would be doing Keeley a favor by killing him. Hermosillo also told Alvarado that he "just felt like he'd want to do him in" like Dr. Kevorkian. During Alvarado's interview with police, Alvarado stated that a few days before Keeley's death, Hermosillo said "the old man is dying and he would like to end it for him."

Hermosillo's statements made after the killing show premeditation. The morning after the killing, Hermosillo told Alvarado about what he had done. He told Alvarado that he crossed Keeley's arms and watched over him as he slept. When Keeley gasped for air, Hermosillo shoved the sandwich into Keeley's mouth and then smothered him with a pillow.

Before the murder, Hermosillo had been taking money from Keeley's checking account by forging Keeley's signature on checks. James Dougan testified that Hermosillo took the checks from Keeley. Some checks were made out to Dougan, and Hermosillo and Dougan would cash them. They would split the money between them. When asked if he ever saw Hermosillo write out any of the checks, Dougan said there might have been one time, but he was not positive. On redirect examination, he denied seeing the victim write any of the checks. When asked if Hermosillo had ever told him not to worry about the checks anymore, Dougan said he did so about 1 to 2 weeks after Keeley was killed. A forensic scientist with the Kansas Bureau of Investigation testified that Hermosillo's fingerprints were found on five of the six checks. Keeley's fingerprints were not found on any of the suspect checks. Another expert testified that upon examination of the handwriting on the checks, there was a strong indication that Keeley did not sign the checks.

The evidence, considered in the light most favorable to the State, shows that a rational factfinder could have found that the act of killing Keeley was one that Hermosillo thought over beforehand

and then carried out. Sufficient evidence supports the premeditated murder conviction.

*Failing to Instruct the Jury on Second-degree Intentional Murder*

Next, Hermosillo argues that the district court erred by failing to instruct the jury on the lesser included offense of second-degree intentional murder. This contention lacks merit. Hermosillo neither requested a second-degree intentional murder instruction nor objected to its omission. During the jury instructions conference, the judge said: "There are no lesser included charges instructed upon nor requested. And I don't think there's any evidence from which a lesser included charge could be arrived at." When asked whether he was requesting any other instructions, defense counsel said, "No, I have to . . . concur with the court's conclusions."

Second-degree intentional murder is a lesser included offense of first-degree intentional murder. *State v. Armstrong*, 240 Kan. 446, 459, 731 P.2d 249, *cert. denied* 482 U.S. 929 (1987). No party may assign as error the failure to give an instruction, including a lesser included crime instruction, unless the party objects before the jury retires. The objecting party must distinctly state the matter objected to and the grounds for the objection, unless the failure to give the instruction was clearly erroneous. K.S.A. 2000 Supp. 22-3414 (3); *State v. Gould*, 271 Kan. 394, 401, 23 P.3d 801 (2001). Thus, we ask whether the failure to give the instruction is clearly erroneous. Instructions are clearly erroneous only if we are firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997).

Without identifying any evidence to support his argument, Hermosillo asserts that the jury could have concluded that he intentionally killed Keeley but did not premeditate the killing. As the State aptly observes, this case did not contain evidence of second-degree murder. The defense theory at trial was that Keeley died of natural causes and that Hermosillo was the "teller of tall tales." The State presented evidence that before Keeley's murder, Hermosillo talked to friends about killing Keeley. Alvarado testified that Hermosillo told him that "he crossed his arms and well, he

waited above [Keeley] when, he watched him sleeping. [Then] he gasped for air . . . and [Hermosillo] shoved a sandwich in his mouth and sat on his chest and smothered him." Failure to give such an instruction was not error.

### Hermosillo's Statements Made During a Custodial Interrogation

Hermosillo contends that the district court erred by denying his motion to suppress his recorded interview. He argues that his statements should have been suppressed because he failed to give a voluntary, knowing, and intelligent waiver of his *Miranda* rights. We disagree.

Our standard of review is whether the district court's ruling was supported by substantial competent evidence. See *State v. Minor*, 268 Kan. 292, 297, 997 P.2d 648 (2000). In determining whether the accused's confession is voluntary, we look to the totality of the circumstances. *State v. McCorkendale*, 267 Kan. 263, 270-71, 979 P.2d 1239 (1999).

At the suppression hearing, the district court heard the testimony of police Sergeants Alvin Sowers and Ron Meredith. About 2 hours after his arrest, the officers began their interview with Hermosillo. First, Hermosillo was read his *Miranda* rights. Sergeant Sowers testified that Hermosillo acknowledged that he understood each of those rights. He signed a waiver showing that he wanted to speak to the officers. Hermosillo told Sergeant Sowers that he knew about the *Miranda* rights because he watched television. According to Sowers, Hermosillo did not request an attorney and never asked to stop the questioning. About every hour, the officers took a little break. When asked at trial if Hermosillo had been intoxicated or on drugs, Sowers said, "No." Sergeant Meredith testified that Sowers had accurately portrayed what had occurred in the interrogation room.

Hermosillo emphasizes that on cross-examination, Sergeant Sowers admitted that he did not find out about Hermosillo's educational level. However, on direct examination, Sowers agreed that he was able to have a "normal conversation" with Hermosillo. Hermosillo also notes that Sowers did not ask whether he was under the influence of alcohol. Sowers testified, however, that based

on his experience he did not smell alcohol or notice anything that would give a reason to believe Hermosillo was under the influence.

Sowers also testified that Hermosillo's interview was recorded. He said he did not believe Hermosillo knew the recorder was on until the end of the interview. On cross-examination, Sowers was asked his reason for not telling Hermosillo that the interview was being taped. He said, "Well, [we] seem to get a better statement off people when they don't think they're being recorded. A better interview may be more truthful." Sowers said he thought that during the interview, Hermosillo saw the recorder. The transcript of the interview shows that Hermosillo asked the officers if they "got it" on their "tape recorder." Sergeant Meredith said, "That's a radio." Hermosillo replied, "Oh, thought it was a tape recorder." Later, Hermosillo said, "You guys got your recorder going or something like that, because I don't want to say something then change it and then get in trouble for saying something dumb." Sowers responded, "You aren't going to say something dumb." Hermosillo replied, "Well, to me, it's going to sound stupid." At the end of the interview, he requested that the officers turn off the recorder, and the officers complied.

Defense counsel challenged the introduction of Hermosillo's statements, claiming that they were not voluntary because he did not know the statements were being recorded. On appeal, Hermosillo argues, without authority, that the officers' failure to tell him about the recorder was a "tactic," calling into question the voluntariness of his statements. Hermosillo relies on *United States v. Palmer*, 203 F.3d 55 (1st Cir.), *cert. denied* 530 U.S. 1281 (2000). *Palmer* does not support his contention. In *Palmer*, the prosecutor, during closing argument, made reference to his own personal beliefs and appealed to those of the jury, saying, "You do it. I do it," to explain a detective's decision to record Palmer's confession but not the entire custodial interrogation. 203 F.3d at 58. Palmer argued that the prosecutor's "You do it," "I do it" remarks during final argument violated his due process rights. The First Circuit Court of Appeals, acknowledging that the prosecutor's remarks indirectly vouched for the detective witness, affirmed Palmer's convictions. 203 F.3d at 65.

The district court here found that Hermosillo made the statements "knowingly and that there was no evidence of coercion, threat or intimidation to get him to talk to the officers." We agree.

### Prosecutorial Misconduct

Finally, Hermosillo contends that the prosecuting attorney committed misconduct during opening statements and closing arguments, depriving him of his constitutional right to a fair trial. We disagree.

Hermosillo made no objection to the prosecutor's opening statements at trial. However, the contemporaneous objection rule does not apply to opening statements because it is impossible to foresee which comments counsel might fail to establish through the evidence at trial. "Absent substantial prejudice to the rights of the defendant, there must be a showing of bad faith on the part of the prosecutor before relief may be granted as a result of a prosecutor's reference in his opening statement to matters not provable or which the prosecutor does not attempt to prove at trial." *State v. Ruebke*, 240 Kan. 493, 503-04, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

The following remarks were included in the prosecutor's opening statement:

"The defendant crept up to Mr. Keeley bizarrely armed with a sandwich in one hand and a pillow in the other. The defendant then shoved a sandwich in Mr. Keeley's mouth, covered his face with a pillow and laid on him until there was no more life in Mr. Keeley. It was all over in a short period of time. The defendant got off Mr. Keeley and the body twitched."

Hermosillo asserts that the prosecutor "had to know that there was no way he could prove those facts." However, a review of the record shows that four witnesses, Rita Corbin, James Dougan, Janice Dougan, and Danny Alvarado, testified that Hermosillo told them that he killed Keeley. Three of those witnesses, Rita Corbin, James Dougan, and Danny Alvarado, testified that he told them he killed Keeley with a sandwich and a pillow. Hermosillo also told officers that he brought a sandwich to Keeley. Although it does not appear that the evidence showed that the body "twitched," Hermosillo has not shown prejudice or bad faith by the prosecutor. As

often occurs in trial, the proof a party anticipates does not always materialize. See *State v. Campbell*, 210 Kan. 265, Syl. ¶ 9, 500 P.2d 21 (1972). A prosecuting attorney is given reasonable latitude in stating to the jury the facts he or she proposes to prove. See *State v. Jackson*, 222 Kan. 424, 430-31, 565 P.2d 278 (1977).

We also note that the jury was instructed:

"Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded."

Hermosillo failed to object to the prosecutor's closing argument. Generally, we do not apply the plain error rule. Reversible error normally cannot be predicated upon a complaint of prosecutorial misconduct during closing arguments where no contemporaneous objection is lodged. However, if the prosecutor's statements rise to the level of violating either a defendant's right to a fair trial or his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *State v. Finley*, 268 Kan. 557, 571, 998 P.2d 95 (2000).

During his closing, the prosecutor argued that there were at least three possible motives for the commission of the murder:

(1) "The defendant didn't have a job, he needed money, he was stealing from Mr. Keeley, *he killed him to cover it up.*"
(2) "[M]aybe a delusional sense of misguided purpose such as Dr. Kevorkian, or at least those were the words the defendant used to Danny Alvarado and to the police officers."
(3) "He did it just for the thrill of it. . . . And lastly, it could be a combination of any of these three why the defendant killed Mr. Keeley."

The State contends that the above statements were based upon the evidence presented at trial. Regarding the theory of greed, Dougan testified about Hermosillo's taking Keeley's checks and cashing them. One or two weeks after Keeley's death, Hermosillo told James Dougan not to worry about the checks anymore. Rita Corbin testified that Alvarado told her that Hermosillo had been talking about killing Keeley and that it had something to do with money. Regarding the theory of a mercy killing, Hermosillo talked about doing Keeley a "favor" by killing him and used the term

"Kevorkian" to Alvarado. He told police that he was not into killing "old people" like "Dr. Kedevorkian [*sic.*]." Regarding a "thrill kill," Sergeant Sowers testified that he looked at these motives, including whether Hermosillo may have killed Keeley just for the thrill of it.

Hermosillo has not shown the prosecutor's closing remarks to be improper. The remarks did not prejudice the jury against Hermosillo and deny him a fair trial. See *State v. Campbell*, 268 Kan. 529, 539, 997 P.2d 726, *cert. denied* 531 U.S. 832 (2000).

Affirmed.