No. 91,810

STATE OF KANSAS, *Appellee,* v. SAMUEL JONES, JR., *Appellant.*

109 P.3d 1158

Opinion filed April 22, 2005.

*Virginia A. Girard-Brady,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Michael A. Russell,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: A jury convicted Samuel Jones, Jr., of first-degree premeditated murder, and the trial court sentenced him to life in prison without eligibility of parole for 25 years. He appeals directly to this court pursuant to K.S.A. 22-3601(b)(1) (convicted of off-grid crime).

Jones raises two issues on appeal:

1. Did the trial court commit reversible error in refusing to grant Jones' request for instructions on the lesser-included offenses of second-degree intentional murder and voluntary manslaughter?

2. Did the State fail to prove the element of premeditation beyond a reasonable doubt?

We reject Jones' argument concerning insufficient premeditation evidence, but we reverse and remand for a new trial because

of the refusal to instruct on second-degree intentional murder. At oral argument, Jones abandoned his claim regarding the refusal to instruct on voluntary manslaughter.

## FACTS

Dhansukh Patel was on duty as manager at the Relax Inn in Kansas City, Kansas, on November 1, 2001. At 3 or 4 p.m., Mr. Patel checked in a black man with two duffel bags. The man filled out the hotel registration card as "Mr. and Mrs. Samuel Jones, Chicago, Illinois." Mr. Patel first checked Jones into Room 125, but was informed a few minutes later that the room had a toilet problem. Patel then moved Jones and his companion, a white female, to Room 118, and Mr. Patel watched them enter the room. Mr. Patel worked until 3:45 the next morning. He did not see anyone else enter room 118, and only saw Jones once more, when Jones came to the office to get ice.

Pushpa Patel is Dhansukh's ex-wife and owner of the Relax Inn. She came on duty between 3 and 4 a.m. on November 2. Two other people were in the office with Mrs. Patel when Jones arrived between 4 and 5 a.m. to check out of his room and return his room key. Mrs. Patel asked Jones if he had shut the room door, and he told her that he had. Mrs. Patel did not see whether Jones had luggage and did not see whether he left in a car or walked.

A few hours later, Mrs. Patel went to the room to pull the sheets off the bed. After she unlocked the door, she saw a jacket-covered body on the floor by the bed. Mrs. Patel asked another guest to see if the body was a real person. After confirmation, Mrs. Patel shut the door, went to the office, and called 911.

Police were dispatched to the Relax Inn at 8:16 a.m. They secured the area and took a statement from Mrs. Patel. She was shown a photographic lineup, and she identified the guest who checked out between 4 and 5 a.m. as Jones. Mr. Patel, however, was unable to identify the man who had checked into the room. Police spoke to other guests but were unable to find any potential witnesses among them. Police identified the victim as Christina Paddock.

Thomas Wheeler, a crime scene investigator, entered the room and observed a female body on the floor at the foot of the bed. On the unmade bed were a mattress pad and two pillows, one with a pillowcase. There were injuries to Paddock's face and some cloth around her neck. A black bra was found on her arm, a black nylon jacket was by her head, and a black T-shirt was near her waist under her arm. Wheeler observed that her pants were unbuttoned. He saw blood on the chairs, on an end table between the chairs, and on the walls. Officers also took the P-trap from under the sink on the possibility that the murderer had cleaned up and blood had collected there.

A typical room contained a king-sized bed, a mattress pad, two sheets, a comforter, two pillows with pillowcases, two large towels, and two small towels. Wheeler believed that the murderer had cleaned up after the murder because the sheets, the comforter, a pillowcase, and towels were missing, and the room was pretty clean. The peephole of the door had a piece of paper plugged into it, so a person could not see through it. There did not appear to be any signs of forced entry. Although the officers searched the area of the motel, they did not find any of the items missing from the room.

Dr. Erik Krag Mitchell performed an autopsy on Paddock's body later that day. The pattern of postmortem blood settling suggested that after death, Paddock's body had sat for a number of hours and then was moved onto her back. At room temperature, it would take approximately 8 to 10 hours for the blood to settle in this pattern. Wet blood came from her mouth and nose, and some dried blood was on her skin. Most of the blood came out of the inside of the face, probably from small blood vessels that broke in the nasal pharynx. Paddock's palms were relatively clean of blood, but the creases had deposits of blood, indicating that someone had done an incomplete job of cleaning blood off of her. Smears of blood were found along the insides of Paddock's thighs underneath her jeans, indicating that the blood had dried onto the skin surface before the pants were pulled up over her legs.

Paddock also had a number of abrasions and bruises over her face, neck, and the rest of her body. Her neck showed abrasions forming parallel lines, a part of a rectangle inside part of a larger

rectangle, possibly from a belt buckle or similar instrument. She also had a brush abrasion on the right side of her back, consistent with dragging. Other abrasions and bruises on Paddock's elbows were consistent with movement before death. Fingernail marks on Paddock's neck could have been from strangulation itself or from Paddock's attempt to remove something from her neck.

Paddock also had very pronounced flame hemorrhages in the muscles between the top of the breast bone and the top of the collarbone and the base of the skull, which are evidence of application of force and distortion of the muscle by force during life. Her hyoid was fractured, which evidences enough pressure to the voice box to tear the small blood vessels behind it. Mitchell testified that it would take only a few seconds under those circumstance to render somebody unconscious, but it would take a few minutes before the person dies. He concluded that Paddock was strangled, possibly with a hand, but using an instrument for at least part of the time.

Officers collected several pieces of evidence from the room for forensic testing. Barbara Crim-Swanson, a forensic scientist with the KBI, examined this evidence to determine what substances were involved. Blood was found on Paddock's clothing, on the bedding, on the wall, in the sink P-trap, on the carpet, and on furniture in the room. Semen was identified in the crotch of Paddock's jeans.

Michael James Van Stratton, the KBI laboratory director, examined the bloodstains. Four areas of blood stain patterns on the wall indicated that Paddock was struck a minimum of four times after blood had come to the surface of her skin. Her face was 2 to 10 inches from the wall, but on or near the floor. The blood on the chair was consistent with someone sitting or leaning on the seat of the chair, and resting on the arm of the chair at some point. The chair was not in an upright position when some of the stains were deposited. Wipe patterns on the chair indicated that something moved through the chair while the blood was still wet. Based upon the bloodstain patterns, he concluded that Paddock had been struck a minimum of four times, that she was on or in close proximity to the chair, that she had been cleaned up afterward, that

she was in close contact with the pillow, and that there was movement of Paddock within the room.

Mary Koch, another forensic scientist with the KBI, examined the evidence to determine whether it matched Paddock's or Jones' DNA. Paddock's DNA was found throughout the room and its contents. A mixture of DNA was found on fingernail scrapings, the black jeans, the trash can, and a black coat. The major portion of those mixtures was consistent with her DNA. The minor portion of the DNA from the trash can was consistent with Jones' DNA. The minor portions of the DNA from the jeans and the fingernail scrapings were consistent with Jones' DNA, but were fairly common DNA mixtures. The minor portion of the DNA found on the coat was insufficient for comparison.

Police did find one witness, Terence Cowans, who had driven Jones and Paddock to the Relax Inn. Cowens had known Paddock for a couple of years, and saw Jones and her as he was driving to lunch between 1 and 2 p.m. on November 1. Cowans stopped to talk to Paddock, and Paddock offered Cowans $10 to drive them to the motel. As he drove to the motel, Cowans asked Jones if he was from the area. Jones replied that he was not, that he was moving and was living at the YMCA. Cowans saw that the man had a duffel bag with him, so he asked Paddock if she knew Jones. She replied, "Yeah, he's cool."

When they arrived at the Relax Inn, Cowans and Paddock stayed in the car while Jones paid for the room. While they were waiting, an acquaintance of Cowans, known as Brisco, came over to the car and asked Cowans what he was doing with Paddock. Brisco told Cowans that Paddock was working for the police. According to Cowans, Jones looked at the first room and came back out, saying that he did not like it. Paddock remained in the car until they entered the second room. Cowans saw Jones carry his duffel bag into the second room, but did not believe that Paddock had any luggage with her.

Sergeant William Brown of the Kansas City, Missouri, Police Department had also seen Jones and Paddock together. He had seen them together on three or four occasions at the Greyhound Bus Station at 1101 Troost in Kansas City, Missouri. The last time

Brown had seen them was a weekday afternoon approximately a week prior to Paddock's death.

Officers investigating the case discovered that Jones had left Kansas City. He was arrested a year later in Chicago, Illinois, and charged with the first-degree premeditated murder of Paddock.

At the jury instructions conference, Jones requested instructions on second-degree intentional murder and voluntary manslaughter. The trial court denied this request, stating:

> "Mr. Sedgwick, your request for lesser included instructions on second-degree murder and voluntary manslaughter would be denied. The only evidence that we have is the evidence that's been presented by the state as it comes to the issue of premeditation. We have the manner and the nature of death in this case. Again, this is not a quick gunshot or something of that nature, it was obviously a brutal killing that took time. It would have had to have taken a number of minutes undoubtedly to have accomplished what took place here. There was an effort immediately afterwards to clean the body, to clean up the room, in other words to destroy any type of evidence as to who committed the crime, and then there was certainly the evidence of flight of the area after the crime. *And I think there's a sufficient amount of premeditation here in this case and there's nothing to take away from the evidence as to premeditation that would warrant an instruction on second-degree murder.*
>
> "As to an instruction on voluntary manslaughter, there is simply no evidence whatsoever that this was a killing that was done in the heat of passion or upon a sudden quarrel or the other elements that would bring into issue the — an instruction on voluntary manslaughter.
>
> "So for those reasons, the request for the lesser included instructions would be denied." (Emphasis added.)

The jury convicted Jones of first-degree premeditated murder, and he was sentenced to life in prison without eligibility for parole for 25 years. Jones filed a motion for a new trial, alleging error in the court's refusal to instruct the jury on the lesser included offenses of second-degree intentional murder and voluntary manslaughter. The trial court denied the motion, stating in part, "I think there was more than sufficient evidence of premeditation, and there was no evidence of anything less than premeditation."

## ANALYSIS

Issue 1: *Did the trial court commit reversible error in refusing to*

*grant Jones' request for an instruction on the lesser-included offense of second-degree intentional murder?*

Jones requested an instruction on second-degree intentional murder, a lesser included offense of first-degree premeditated murder. The difference between the two crimes is that the latter includes the element of premeditation. See *State v. Amos*, 271 Kan. 565, 571, 23 P.3d 883 (2001). In *State v. Drennan*, 278 Kan. 704, 712-13, 101 P.3d 1218 (2004), we stated our standard of review of a refusal to instruct on a lesser included offense as follows:

"A trial court must instruct the jury on a lesser included offense 'where there is some evidence which would reasonably justify a conviction' of the lesser offense. K.S.A. 2003 Supp. 22-3414(3). 'If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive.' *State v. Hoge*, 276 Kan. 801, 805, 80 P.3d 52 (2003). On review, the appellate court views the evidence in the light most favorable to the defendant. *State v. McClanahan*, 254 Kan. 104, 109, 865 P.2d 1021 (1993). 'However, the duty to so instruct arises only where there is evidence supporting the lesser crime.' *State v. Spry*, 266 Kan. 523, 528, 973 P.2d 783 (1999). An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. *Hoge*, 276 Kan. at 805."

Similarly, as we stated 8 months earlier in *State v. Young*, 277 Kan. 588, 599-600, 87 P.3d 308 (2004):

"The instruction need not be given if the evidence would not have permitted a rational factfinder to find the defendant guilty beyond a reasonable doubt of the lesser included offense. *State v. Bolton*, 274 Kan. 1, 7, 49 P.3d 468 (2002). Stated another way, a criminal defendant has a right to an instruction on all lesser included offenses as long as '(1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense.' *State v. Williams*, 268 Kan. 1, 15, 988 P.2d 722 (1999)."

In short, Jones has a right to an instruction on second-degree intentional murder as long as the evidence, when viewed in the light most favorable to him, would reasonably justify a jury's conviction on the offense, and the evidence does not exclude a theory of guilt on it.

As support for Jones' claim of error, he points out that there were no witnesses to the murder and that only circumstantial evidence existed on how the murder occurred. Although death by strangulation may take a certain amount of time, Jones argues that a jury could have found the death was intentional but not premeditated.

The State responds that all the evidence showed premeditation. It points to the evidence of the beating, the strangulation itself, and Jones' attempts to cover up the crime. The State also argues that Jones' theory of defense was that he did not commit the murder, not that the murder was unpremeditated.

In denying the requested instruction at the conference, the trial court found that there was a "sufficient amount of premeditation" and there was "nothing to take away from the evidence as to premeditation that would warrant an instruction on second-degree murder." When denying the motion for new trial, the trial court reiterated, "I think there was more than sufficient evidence of premeditation, and there was no evidence of anything less than premeditation." We interpret the court's remarks in both settings to mean there was *no* evidence of less than premeditated conduct. We disagree with the court's findings. Moreover, we conclude that when viewed in the light most favorable to Jones, the evidence would permit a jury to have convicted him of second-degree intentional murder. See *State v. Drennan*, 278 Kan. at 713; *State v. Young*, 277 Kan. at 599. In forming this conclusion, we examine not only the evidence supporting premeditation, but also the evidence supporting mere intentional conduct, *e.g.*, lack of premeditation.

We begin by observing that premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516 (2001) (citing *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 [1997]). Consequently, it means something more than the instantaneous, intentional act of taking another's life. *State v. Jamison*, 269 Kan. 564, 573, 7 P.3d 1204 (2000); see PIK Crim. 3d 56.04(b). However, premeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a rea-

sonable one. In such a case, the jury has the right to make the inference. *Scott,* 271 Kan. at 108 (citing *State v. Buie,* 223 Kan. 594, 597, 575 P.2d 555 [1978]).

Circumstances which may give rise to an inference of premeditation include: (1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *State v. Meeks,* 277 Kan. 609, 622, 88 P.3d 789 (2004).

In this case, based upon several of the factors listed in *Meeks,* the evidence of premeditation admittedly is substantial.

Considering the nature of the weapon used, Paddock was strangled. The expert testified that only a few seconds would be needed to render her unconscious, but several minutes would be needed to kill her. The strangulation could have been manual, but was accomplished by an instrument for at least part of the time. This court has stated that death by strangulation can be strong evidence of premeditation. *Scott,* 271 Kan. at 108; see also *State v. Brown,* 234 Kan. 969, 972-73, 676 P.2d 757 (1984) (evidence of premeditation sufficient where severely beaten victim was killed by strangulation).

Next, there is no evidence whatsoever of Paddock's possible provocation of Jones.

Regarding Jones' conduct before and after the killing, Paddock had abrasions and bruises on her elbows that were consistent with movement before she died. An expert testified that Paddock had been dead for a number of hours before her body was moved from a sitting position to lying on the floor on her back. Paddock's pants had then been placed on her after someone had attempted to wash blood off of her. A brush abrasion on her back was consistent with dragging. Evidence also showed that someone had attempted to clean up the blood on Paddock, the wall, and on items in the room. Evidence further showed that some items, such as the comforter, sheets, a pillowcase, and towels had been removed, presumably after being used to clean up the scene. There was also a piece of paper plugged into the peephole of the door, though there was no

evidence whether it was plugged prior to Jones and Paddock entering the room. Jones checked out of the room early in the morning on November 2 and was found a year later in another state.

Finally, concerning the dealing of lethal blows after the deceased was felled and rendered helpless, there is evidence that Paddock was struck in the head four times while she was lying on the floor near the wall.

While a jury could infer premeditation, based upon the factors stated in *Meeks* it could also reasonably find that no premeditation existed. Concerning Jones' conduct before the killing, the State concedes that there was no evidence of premeditation before Jones and Paddock entered the motel room, *e.g.*, no evidence of Jones' threats to Paddock or declarations made of his intent to kill her. Nor was there any attempt made by Jones to conceal his identity: he gave his correct name to Mr. Patel, along with his home, when signing the motel register. Nor did he attempt to conceal himself from Mr. Patel when he later went to the office for ice. Additionally, there was no evidence of Jones' threats to Paddock or declarations made of his intent during the murder. Finally, while Jones did clean up the room to cover up the crime, he made no attempt to avoid detection by checking out and returning his key to Mrs. Patel, and by answering her question, in front of two other guests in the motel office early the next morning. He then returned to Chicago, his apparent home.

In short, the difficulty arises out of the complete lack of evidence explaining exactly why Paddock was killed. While the evidence points to Jones as the perpetrator, legitimate questions exist as to his state of mind at the time of the murder, *i.e.*, whether she was killed with premeditation or simply with intent, however prolonged. In *Scott,* 271 Kan. at 111, this court held that the jury could find that defendant's change of "state of mind," from intentional to premeditation, occurred at any time during the violent episode before he caused the victim's death, including at any time during the strangulation. Similarly, the jury in the instant case could have found that Jones never changed his state of mind, from intentional but unpremeditated to premeditated, before he caused Paddock's death, including at any time during the strangulation. The jury,

however, was only given the choice between deciding Jones either killed her with premeditation, or did not kill her.

We fully acknowledge this court has determined that instructions on second-degree intentional murder were not required in several other strangulation cases. In *State v. Boorigie*, 273 Kan. 18, 41 P.3d 764 (2002), the defendant requested instructions on second-degree murder and voluntary manslaughter as lesser included offenses of the first-degree premeditated murder of his wife, who had died of strangulation and then was placed in a laundry room that was set on fire. In upholding the trial court's refusal to instruct on these lesser included offenses we stated:

"As to the present crimes, we note that Jenell was manually strangled and that her death required at least several minutes of constant pressure around her neck. The several minutes required to effect strangulation supported a finding of premeditation. In addition, there was evidence that the defendant had attempted to kill Jenell at least twice in the 2 months preceding her death.

"The jury was presented with two choices: the defendant was not guilty of premeditated murder and arson or the defendant was guilty of premeditated murder and arson. The trial court was correct — *there was no evidence that the murder and arson was not a premeditated act, perpetrated for the purpose of financial gain.*" (Emphasis added.) 273 Kan. at 41.

Boorigie's previous attempts to kill the victim, which strongly indicated premeditation, make it further distinguishable from the instant case.

Another defendant convicted of first-degree premeditated murder failed to request an instruction on second-degree intentional murder, but argued on appeal that it should have been given. *State v. Hermosillo*, 272 Kan. 589, 35 P.3d 833 (2001). While reviewing the issue for clear error, this court held:

"Without identifying any evidence to support his argument, Hermosillo asserts that the jury could have concluded that he intentionally killed Keeley but did not premeditate the killing. *As the State aptly observes, this case did not contain evidence of second-degree murder.* The defense theory at trial was that Keeley died of natural causes and that Hermosillo was the 'teller of tall tales.' The State presented evidence that before Keeley's murder, Hermosillo talked to friends about killing Keeley. Alvarado testified that Hermosillo told him that 'he crossed his arms and well, he waited above [Keeley] when, he watched him sleeping. [Then] he gasped for air . . . and [Hermosillo] shoved a sandwich in his mouth

and sat on his chest and smothered him.' Failure to give such an instruction was not error." (Emphasis added.) 272 Kan. at 595-96.

*Hermosillo* is further distinguishable from the present case because that court was reviewing for clear error, a much more stringent standard for a defendant to overcome. *Hermosillo*, 272 Kan. at 595 ("Instructions are clearly erroneous only if we are firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred."). Moreover, the case is distinguishable because Hermosillo had made statements before the murder about killing Keeley, which is strong evidence of premeditation. See *State v. Amos,* 271 Kan. 565, 572, 23 P.3d 883 (2001) ("There is no evidence to suggest the killing of James was not premeditated. The trial court did not err in failing to instruct on second-degree intentional murder.").

Finally, we disagree with the State's contention that Jones' theory of defense was contrary to the instruction he requested. The cases cited by the State, *State v. Lewis,* 256 Kan. 929, 889 P.2d 766 (1991), and *State v. Reynolds,* 230 Kan. 532, 639 P.2d 461 (1982), stand for the proposition that a defendant's use of an alibi defense narrows the issue at trial to identity. Jones, however, did not present evidence of an alibi. He had no witnesses testify for him and, as allowed by the Fifth Amendment, elected not to testify himself. There was also no evidence of any statements ever made by Jones regarding the murder.

In conclusion, despite the substantial evidence of premeditation, there was also enough evidence upon which a jury could have reasonably convicted Jones of second-degree intentional murder. Jones was entitled to an instruction on that crime, and it was reversible error not to have given one.

*Issue 2: Did the State fail to prove the element of premeditation beyond a reasonable doubt?*

Although we are reversing and remanding for a new trial, we must also address Jones' argument that the State failed to prove the element of premeditation beyond a reasonable doubt, which would warrant simple reversal of the conviction. See *State v. Elnicki,* 279 Kan. 47, 68, 105 P.3d 1222 (2005); *State v. Kunellis,* 276

Kan. 461, 474-75, 78 P.3d 776 (2003) (erroneous jury instructions required reversal and remand, but evidence was sufficient to support convictions of felony murder and theft).

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Elnicki*, 279 Kan. at 69. This standard and the standard for determining whether the second-degree intentional murder jury instruction should have been given both involve considering the evidence in the record. The standard of review of the present issue, however, is much more favorable to the State.

In order to convict Jones of first-degree premeditated murder, the State had to prove that he killed Paddock intentionally and with premeditation. See *State v. Scott*, 271 Kan. at 108 (citing K.S.A. 21-3401(a); *State v. Juliano*, 268 Kan. 89, 97, 991 P.2d 408 [1999]). Intent is not contested by Jones on appeal. As discussed previously, the nature of the weapon used, the lack of provocation by Paddock, some of Jones' conduct before and after the killing, and the apparent dealing of lethal blows after Paddock was felled and rendered helpless all show premeditation. Such evidence was sufficient for a rational factfinder to find him guilty of first-degree premeditated murder beyond a reasonable doubt.

The decision of the district court is reversed and the case is remanded for a new trial.

GERNON, J., not participating.

LARSON, S.J., assigned.